UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Jan 12  3 50 PM '04

------------------------------------X
NORMAN C. BLOOM,
      *Plaintiff,*

   v.                                  3:02CV907(PCD)

MICHAEL A. DOUGLAS,
      *Defendant.*
------------------------------------X
MICHAEL A. DOUGLAS,
      *Third-Party Plaintiff,*

   v.                                  December 5, 2003

NORMAN C. BLOOM REVOCABLE
TRUST, NORMAN R. BLOOM FAMILY
SPRAY TRUST, and NORMAN R. BLOOM
IRREVOCABLE INSURANCE TRUST
      *Third-Party Defendants.*
------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
NORMAN C. BLOOM AND THIRD-PARTY DEFENDANTS
NORMAN R. BLOOM REVOCABLE TRUST, NORMAN R. BLOOM FAMILY
SPRAY TRUST, AND NORMAN R. BLOOM IRREVOCABLE
INSURANCE TRUST'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust submit this Memorandum of Law in support of their motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment for a determination by this court that defendant/third-party

---

[1] No reference can be made to the deposition testimony of defendant/third-party plaintiff Michael A. Douglas because Michael A. Douglas has failed on five separate occasions, at the last minute, to appear for his deposition. That last such failure occurred on November 24, 2003. As a result of defendant/third-party plaintiff Michael A. Douglas's failure, plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust have been prejudiced in that his testimony is not available for purposes of plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust's Motion for Summary Judgment.

1

plaintiff Michael A. Douglas was engaged in the unauthorized practice of law in the State of Connecticut.

## STATEMENT OF FACTS

This case arises out of the unauthorized practice of law by defendant/third-party plaintiff Michael A. Douglas, an attorney admitted to practice law <u>only in the State of New York</u>, in Connecticut during the period of 1995 to and including 2002.

On August 22, 1989, Norman R. Bloom, the father of plaintiff Norman C. Bloom, died. Prior to his death, Norman R. Bloom and Hillard Bloom, Sr., his twin brother, had compiled substantial assets as a result of having engaged in the business of commercial shellfishing in Long Island Sound. Those assets included shellfish grounds stretching from Branford, Connecticut to Greenwich, Connecticut, and shellfish grounds in or about Port Norris, New Jersey. The Bloom Brothers, as they were known, traded under the name of Tallmadge Brothers, Inc. The assets of Tallmadge Brothers, Inc. and other assets which Norman R. Bloom owned were controlled by three trusts; i.e., the third-party defendants herein, or were held in partnership with his twin brother, Hillard Bloom, Sr. In effect, Hillard Bloom, Sr. controlled, or through other persons who allided themselves with Hillard Bloom, Sr., all of the assets to which plaintiff Norman C. Bloom was entitled to receive upon his father, Norman R. Bloom's death.

Moreover, at the time of his father, Norman R. Bloom's death, plaintiff Norman C. Bloom was employed by Tallmadge Brothers, Inc., which was controlled and run by his uncle, Hillard Bloom, Sr. Although Norman C. Bloom continued to work for Tallmadge Brothers, Inc., Hillard Bloom, Sr. refused to provide plaintiff Norman C. Bloom with his just share or his father's assets. Additionally, when plaintiff Norman C. Bloom injured his back, his uncle Hillard Bloom, Sr. refused to pay him workman's compensation. Following that dispute, Hillard Bloom, Sr. refused to

allow plaintiff Norman C. Bloom to return to work at Tallmadge Brothers, Inc. and further refused to provide him with his just share of his father, Norman R. Bloom's estate.

Because plaintiff Norman C. Bloom had retained Robert Slavitt, Esq. of the law firm of Slavitt, Connery & Vardamis to represent him on his workman's compensation claim against Tallmadge Brothers, Inc., he also sought and used Robert Slavitt, Esq. for legal advice concerning any claims he might have against the executors and/or trustees of his father Norman R. Bloom's estate, and against his uncle Hillard Bloom, Sr. At some point in time in or about 1993, Robert Slavitt, Esq. advised plaintiff Norman C. Bloom that there was nothing further that he could do for the plaintiff Norman C. Bloom with respect to his claims against the executors/trustees of the Estate of Norman R. Bloom and his uncle, Hillard Bloom, Sr.

Thereafter, in late 1994 or early 1995, plaintiff Norman C. Bloom became acquainted with defendant/third-party plaintiff Michael A. Douglas, who was residing at 1 and 2 Seaside Place, East Norwalk, Connecticut, approximately one-half (1/2) block away from where plaintiff Norman C. Bloom, his wife Debbie, and their two children were residing.

That after defendant/third-party plaintiff Michael A. Douglas had befriended plaintiff Norman C. Bloom, he convinced plaintiff Norman C. Bloom and his wife Debbie Bloom that he could provide plaintiff Norman C. Bloom with the requisite legal advice so that plaintiff Norman C. Bloom might obtain that portion of the assets of his father Norman R. Bloom's estate, of which he had been deprived by his uncle Hillard Bloom, Sr. To that end, defendant/third-party plaintiff Michael A. Douglas drafted a contract; i.e., the June 19, 1995 Agreement, which set forth the terms of the parties' agreement and Michael A. Douglas's remuneration for his services. (See Exhibit A – executed copy of the Agreement)

That Agreement states in full as follows:

AGREEMENT between Norman C. Bloom residing at 3 Fifth Street, East Norwalk, Connecticut, hereinafter known as "Bloom" and Michael A. Douglas, attorney licensed to practice in the state of N.Y. with office at 13 E 16 Street, N.Y. N.Y. Hereinafter known as "Douglas" agree to the following:

1. That "Bloom" is an heir to his father's estate. His father Norman R. Bloom died in October 22, 1989 and probate proceeding currently is going on in the district of Norwalk, Connecticut.

2. That while the proceedings has been going on <u>"Bloom" has not retained satisfactory probate council</u> but has instead relied on the council for the trustee of the various trusts to represent his various interests within and without the estate.

3. It is the intention and desire of "Bloom" <u>that it would be in his best interest to have his own legal consultant</u> whose duties would be the following:
   a) <u>To review all documents since the inception, i.e. wills, codicils, trust documents, correspondence, probate papers, tax documents, etc.</u>
   b) <u>Review all actions of the executors, trustees, and others related to the estate</u>.
   c) <u>Help in asserting the true value of and extent of the assets of the estate</u>.
   d) <u>Helping in planning strategy both in relation to the executor, trustees and their attorneys so as to best protect the client's interest</u>.

4. It is understood that "Douglas" role shall be that of "Consultant" not attorning in these proceeding.

5. It is agreed between the parties that "Douglas" shall be paid at the rate of $200.00 per hour, having consulted approximately ten hour to date.
   a) The parities shall sign a time sheet in hours on a monthly basis.
   b) Additionally, over and above the hourly rate: Because "Douglas" shall not be paid until the estate is settled, any moneys, derived over and above the agreed current estimated value of "Bloom" share "Douglas" shall be entitle to 5% of gross value. The parties shall meet within two weeks from this date to mutually determine a current estimated value of "Bloom's" share.

(emphasis added)

The "Agreement" called for Michael A. Douglas to receive a fee of <u>$200.00 per hour</u> plus a contingency fee of 5% of the 1/3 share plaintiff Norman C. Bloom would be entitled to of his father's estate. During the time period of January 6, 1995 to and including November 30, 1996; i.e., a period of 11 months, Michael A. Douglas billed plaintiff Norman C. Bloom <u>$106,000.00</u> or 530 hours @ $200.00 per hour. (500 hours equals 13.25 forty hour weeks, or approximately one quarter of a year)

Thereafter, defendant/third-party plaintiff Michael A. Douglas had plaintiff Norman C. Bloom execute on September 29, 1995 an "Amendment to Agreement." The "Amendment to Agreement" set forth the percentages that defendant/third-party plaintiff Michael A. Douglas was to receive as the contingency portion of his fee.

Subsequently, in January 1997, defendant/third-party plaintiff Michael A. Douglas had plaintiff Norman C. Bloom execute a "Second Amendment to Agreement", which addressed the change of the attorneys appointed by the trustee; i.e., Westport Bank & Trust Company, to Cohen and Wolf, P.C. as Connecticut counsel. (See Exhibit B)

The "Second Amendment to Agreement" states, in full:

> SECOND AMENDMENT TO AGREEMENT dated June 19, 1995, between NORMAN C. BLOOM, residing at 3 Fifth Street, East Norwalk, Connecticut, hereinafter known as "BLOOM" and MICHAEL A. DOUGLAS, attorney with offices at 13 East 16th Street, New York, N.Y. hereinafter known as "DOUGLAS", agree to the following:
>
> 1- That _due to a change of strategy_, it was agreed between the parties that "BLOOM" would retain separate attorneys in Connecticut to represent his interests, instead of depending on the attorneys for the Trustee i.e. Westport Bank & Trust Co.
>
> 2- In addition to retaining new Counsel it was agreed between the "BLOOM" and "DOUGLAS" _that Douglas would play a more active role, i.e. accompanying "BLOOM" at legal proceedings and meetings and actively join the new attorneys COHEN & WOLF in the decision making process._
>
> 3- As such, it was agreed between the parties that while the aforementioned AGREEMENT (June 19, 1995) and the first AMENDMENT (September 19, 1995) is still in effect, due to changes in "DOUGLAS'S" role, "BLOOM" on receipt of "DOUGLAS'S" bill shall pay "DOUGLAS" for his expenses and make an occasional payment against the accumulated HOURLY WORK bill when possible.
>
> 4- "DOUGLAS" acknowledges payment by "BLOOM" of $10,000.00 against the aforementioned bill.
>
> 5- "BLOOM" acknowledges the outstanding bill of $106,800. Dating from June of 1995 going through November 30, 1996.

(emphasis added)

5

Not only do the agreements drafted by defendant/third-party plaintiff Michael A. Douglas clearly demonstrate that defendant/third-party plaintiff Michael A. Douglas was to provide legal advise to plaintiff Norman C. Bloom, the various statements for services and disbursements that defendant/third-party plaintiff Michael A. Douglas, himself, tendered to plaintiff Norman C. Bloom contemporaneously during the period of 1995 to 2002 corroborate that, in fact, defendant/third-party plaintiff Michael A. Douglas provided legal advice to plaintiff Norman C. Bloom. The billings that defendant/third-party plaintiff Michael A. Douglas sent to plaintiff Norman C. Bloom clearly state, "STATEMENT OF LEGAL SERVICES RENDERED" or "LEGAL EXPENSES" (See Exhibit C) Thus, it is beyond purview that defendant/third-party plaintiff Michael A. Douglas provided to plaintiff Norman C. Bloom anything other than legal advice, which is what both parties had contemplated from the start.

Additionally, the plaintiff Norman C. Bloom took the depositions of four attorneys involved in the Bloom estate dispute; i.e., 1) Mario Zangari, Esq. and Christine Barker, Esq., the attorneys that were retained by Tallmadge Brothers, Inc., once the two sides of the Bloom family had agreed that it would be split; 2) Richard DiMarco, Esq., who was co-counsel with defendant/third-party plaintiff Michael A. Douglas representing plaintiff Norman C. Bloom from March 1996 to August 2001; and 3) Richard Ziesler, Esq., who represented Robert Bloom, plaintiff Norman C. Bloom's brother. All of the above testified on deposition that they conducted hundreds of conferences with defendant/third-party plaintiff Michael A. Douglas and that almost, if not all, of them took place in the State of Connecticut. Additionally, they testified that they were parties to hundreds of telephone conferences and other telephonic and/or e-mail communications, all of which emanated and/or were received in the State of Connecticut.

Moreover, as an example that defendant/third-party plaintiff took part in negotiating agreements; i.e., contracts executed in Connecticut, and governed by Connecticut law, on behalf of plaintiff Norman C. Bloom, see: 1) Exhibit D, the Retainer Agreement entered into between Cohen & Wolf, P.C. and Norman C. Bloom in March 1996, and 2) the Divisive Reorganization Agreement, executed in Connecticut and governed by Connecticut law, which took approximately years to negotiate, once Siegel, O'Connor, Schiff and Zangari, P.C. was appointed by Tallmadge Brothers, Inc. to split up Tallmadge Brothers, Inc. (See Exhibit D - the deposition transcript of Mario Zangari, Esq.)

Furthermore, defendant/third-party plaintiff Michael A. Douglas wrote to corporate counsel for Tallmadge Brothers, Inc. on September 17, 2001 indicating that Siegel, Connor, Schiff & Zangari, P.C. should deal with Michael A. Douglas, Esq. from that point forward. (See Exhibit E)

Additionally, the discovery responses of defendant/third-party plaintiff Michael A. Douglas (See Exhibits H, I and J) to plaintiff Norman C. Bloom's discovery requests clearly demonstrate that he was dealing with attorneys of other represented parties and performing work that is traditionally considered legal work.

Further, defendant/third-party plaintiff Michael A. Douglas's contemporaneous writings indicate that he believed that he was providing legal services to plaintiff Norman C. Bloom for which he was entitled to a legal fee. (See Exhibit K at page 2)

Additionally, the corporate attorney for Tallmadge Brothers, Inc. recognized that defendant/third-party plaintiff Michael A. Douglas was representing Norman R. Bloom's side of the Bloom Family in the settlement discuss between both sides of the Bloom family. (See Exhibit G)

7

The memoranda authored by defendant/third-party plaintiff Michael A. Douglas further demonstrates that he was providing legal advice to plaintiff Norman C. Bloom and engaging in activity traditionally considered to be the practice of law. (See Exhibit I)

Moreover, defendant/third-party plaintiff Michael A. Douglas was included in attorney-client privileged meetings conducted by Siegel, O'Connor, Schiff and Zangari, P.C. at the demand of defendant/third-party plaintiff Michael A. Douglas.

Thus, if defendant/third-party plaintiff Michael A. Douglas was claiming that his communications with corporate counsel were protected by the attorney-client privilege, it cannot be said now that he was representing plaintiff Norman C. Bloom in any other capacity than that of his lawyers.

## LEGAL ARGUMENT

### POINT I

CONNECTICUT LAW DICTATES THAT EVEN IF AN ATTORNEY IS LICENSED TO PRACTICE LAW OUTSIDE OF CONNECTICUT HE MAY NOT RECOVER ANY LEGAL FEE(S) FOR SERVICES HE PROVIDES TO A CONNECTICUT CLIENT DURING THE TIME PERIOD WHEN HE IS NOT, IN FACT, AN ATTORNEY ADMITTED TO PRACTICE LAW IN THE STATE OF CONNECTICUT

The Courts of Connecticut long ago held that an attorney is practicing law in the State of Connecticut even if he is not appearing in court on behalf of the client.

In State Bar Association of Connecticut v. The Connecticut Bank and Trust Company; State Bar Association of Connecticut v. Hartford National Bank and Trust Company, 145 Conn. 222, 234-35, 140 A.2d 863 (1988), the Supreme Court of Connecticut stated with respect to out of court law practice; i.e., the office/transactional work of lawyers,

> The practice of law consists in no small part of work performed outside of any court and having no immediate relation to proceedings in court. It embraces the giving of legal advice on a large variety of subjects and the preparation of legal

instruments covering an extensive field. Although such transactions may have no direct connection with court proceedings, they are always subject to subsequent involvement in litigation. They require in many aspects a high degree of legal skill and great capacity for adaptation to difficult and complex situations. No valid distinction can be drawn between the part of the work of the lawyer which involves appearance in court and the part which involves advice and the drafting of instruments. The work of the office lawyer has profound effect on the whole scheme of the administration of justice. It is performed with the possibility of litigation in mind, and otherwise would hardly be needed. It is of importance to the welfare of the public that these manifold customary functions be performed by persons possessed of adequate learning and skill and of sound moral character, acting at all times under the heavy trust obligation to clients which rests upon all attorneys. The underlying reasons which prevent corporations and associations, as well as individuals other than members of the bar, from appearing before the courts apply with equal force to the performance of these customary functions of attorneys and counselors at law outside of courts. *Opinion of the Justices*, 289 Mass. 607, 613, 194 N.E. 313.
(emphasis added)

In Perlah v. S.E.I. Corp., 29 Conn. App 43, 44-45 (App. Ct.) 1992, a case involving the transactional work by an attorney who was only admitted to practice law in the State of New York, for a Connecticut corporation, the Appellate Court reversed the Superior Court's allowance of attorneys fees, stating:

> Section 51-88 prohibits the practice of law in or outside a Connecticut courtroom by a person not admitted as an attorney under the provisions of *General Statutes § 51-80*. *Grievance Committee v. Dacey*, 154 Conn. 129, 140, 222 A.2d 339 (1966), appeal dismissed, *386 U.S. 683, 87 S.Ct. 1325, 18 L.Ed.2d 404 (1967)*. In *Dacey*, our Supreme Court rejected the defendant's argument "that the practice of law, out of court, is not forbidden unless carried on as a business . . ." Id. Here, the plaintiff was clearly engaged in the practice of law through his representation of the defendant's investment group even though he did not appear in a Connecticut courtroom.

(emphasis added)

The Appellate Court further held, in finding that Attorney Perlah was not entitled to any compensation while not admitted to practice in Connecticut:

> "Generally, even though duly admitted in another state, an attorney may not recover compensation for legal services unless he has been admitted to practice in the jurisdiction where services were rendered." 7 Am. Jur. 2d 280, Attorneys at Law § 242; see *Taft v. Amsel*, 23 Conn.Sup. 225, 227, 180 A.2d 756 (1960). In *Taft*, the

plaintiff, an attorney licensed in New York sought to recover compensation for legal services performed on behalf of the defendants who were residents of Connecticut. The legal services were primarily rendered in Connecticut and involved the creation of an interstate transportation business. The trial court in *Taft* concluded that the plaintiff was not entitled to any recovery of compensation for legal services.

\* \* \*

Here, the plaintiff practices law in Connecticut, preparing documents for the acquisition of a New York corporation by the defendant's investment group. The plaintiff performed some services before he was admitted to practice in Connecticut on February 11, 1988. We conclude that § 51-88 prohibited the plaintiff from receiving compensation for legal services performed before being admitted to practice in Connecticut.
The trial court's award of attorney's fees to the plaintiff for services performed before being admitted to practice in Connecticut was not legally correct. *Pandolphe's Auto Parts, Inc. v. Manchester, 181 Conn. 217, 221, 435 A.2d 24 (1980).*
The judgment is reversed an the case is remanded for further proceedings to determine the amount of compensation payable for legal services performed in Connecticut after the plaintiff's admission to practice in Connecticut.
(emphasis added)

Moreover, in Taft v. Amsel, 23 Conn. Supp. 225 (1962), a case wherein a New York licensed attorney, seeking a professional relationship with his client, grew out of a family relationship, the Court stated:

> He is not a member of the bar in this state. Their meeting grew out of a former family relationship and the fact that they were summer neighbors in Westport, Connecticut. The services were primarily rendered in this state and dealt with freight transportation problems concerning which the defendant Edward Amsel was well versed.

\* \* \*

> The law seems to be well settled that no one is entitled to recover compensation for services as an attorney at law unless he has been duly admitted to practice before the court, or within the jurisdiction in which the services were rendered, and is an attorney in good standing at the time. *Hardy v. San Fernando Valley Chamber of Commerce, 99 Cal. App. 2d 572; Harris v. Clark, 81 Ind. App. 494;* 7 C.J.S. 1022, § 165; 5 Am. Jur. 353, § 156; note, *118 A.L.R. 646, 652*. And the same rule applies to a claim based on quantum meruit. *Baca v. Padilla, 23 N.M. 223;* 7 C.J.S. 1078, § 191.

Id. at 227-28. (emphasis added)

10

Nor can defendant/third-party plaintiff Michael A. Douglas claim that once plaintiff Norman C. Bloom retained Cohen and Wolf P.C. as local Connecticut counsel, that the legal advice, negotiations and attendance of defendant/third-party plaintiff Michael A. Douglas did not constitute the unauthorized practice of law in Connecticut.

In <u>Servidone Construction Corp. v. St. Paul Fire & Marine Insurance Company and First National Association</u>, 911 F.Supp. 560 (N.D.N.Y. 1995), the Court found that a lawyer admitted to practice in Maryland who represented clients in New York, although he had associated himself with counsel in New York, engaged in the unauthorized practice of law in New York and, therefore, it would violate New York law to allow him to collect attorney's fees.

The Court held:

> First of all, Mr. Goddard argues that § 478 does not apply to his activities on behalf of Servidone because he never appeared as an attorney for Servidone in a court of record in New York State. See Goddard's Memorandum of Law at 5 (citing Goddard Affidavit, p. 16). This argument need not detain the court for long. It is well-settled in New York that "the practice of law forbidden in this State by section 270 of the Penal Law . . . includes legal advice and counsel as well as appearing in the courts and holding oneself out as a lawyer." (citations omitted) Therefore, the fact that Mr. Goddard never appeared in a New York State Court on Servidone's behalf is not dispositive of the issue of whether or not he was engaged in the unauthorized practice of law.

Id. at 565-66.

The Court further stated:

> Furthermore, the court is not entirely convinced that Mr. Goddard's activities do not run afoul of § 478 even if he is considered to be associated with Goddard & Blum. <u>As the court in Jacoby noted in dicta, an attorney who is not licensed to practice law in New York, even if he is associated with a properly constituted law firm in New York, may not "practice" law in this state.</u> See *Jacoby, 61 N.Y.2d at 136, 472 N.Y.S.2d at 893, 460 N.E.2d at* . Under this principle, it would appear that Mr. Goddard's act of entering into an individual retainer agreement with Servidone pursuant to which he undertook the prosecution of the Servidone/Texas matter as Servidone's sole legal representative constitutes the unauthorized practice of law within the meaning of § 478 irrespective of his relationship with Goddard & Blum.

Id. at 572 (emphasis added)

11

\* \* \*

  Having found that Mr. Goddard was engaged in the unauthorized practice of law, the next question is what is the consequence of this conclusion. It is well-settled in New York that "as a matter of public policy, a contract to provide services in violation of [§ 478] is unenforceable ..." *El Gemayel, 72 N.Y.2d at 705, 536 N.Y.S.2d at 409, 533 N.E.2d at* (citing *Spivak v. Sachs, 16 N.Y.2d at 168, 263 NH.Y.S.2d 953, 211 N.E.2d 329; McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 199 N Y.S.2d 483, 166 N.E.2d 494).* Furthermore, when an attorney's fee agreement is unlawful, the attorney has no lien for services performed pursuant to that agreement. See *1907 Op. Atty. Gen. 300* Nor may be maintain an action for quantum meruit for such services. See *Charlebois v. J.M. Weller Assocs., Inc., 72 N.Y.2d 587, 593, 535 N.Y.S.2d 356, 531 N.E.2d 1288, (1988).* Thus, to the extent that Mr. Goddard's claim to the interpleaded funds rests upon his retainer agreement with Servidone, it must be dismissed.

Moreover, in <u>In re James and Clara Peterson,</u> 163 B.R. 665, 672 (B.C. Conn. 1994), the bankruptcy judge disgorged legal fees paid to an attorney appearing in the United States Bankruptcy Court for the District of Connecticut who was licensed in the State of New York because his actions constituted the unauthorized practice of law.

The Court held:

  I find at the outset that Betsos's activities constituted the practice of law. The practice of law is not limited to appearing before state courts; it includes giving legal advice and drafting documents regardless of whether it occurs in a "court of record" and regardless of whether the practice is carried on as a business. *Grievance Comm. of the Bar of Fairfield County v. Dacey, 154 Conn. 129, 140, 222 A.2d 339 (1966), appeal dism'd, 386 U.S. 683 (1967).*

\* \* \*

  <u>Under the first theory, it would be argued that § 51-88(a) does not apply because Betsos limited his practice to federal law and never advised his clients on matters of Connecticut law. Even if that were so, Betsos would still be engaged in the practice of law as defined by Connecticut and bankruptcy courts.</u> *See supra; see also State Unauthorized Practice of Law Comm. v. Paul Mason & Assocs., Inc., 159 Bankr. 773, 778-79 (N.D. Tex. 1993); In re Harris, 152 Bankr. 440, 444-46 (Bankr. W.D.Pa. 1993); In re Bachmann, 113 Bankr. 769, 773-74 (Bankr. S.D. Fla. 1990).* <u>One who advises clients on matters arising under the laws of jurisdictions other than the state in which his or her practice is located is engaged in the practice of law in that state.</u> *See Spanos v. Skouras Theatres Corp., 364 F.2d 161, 165* (en banc) (2d

> Cir.), *cert. denied*, 385 U.S. 987, 17 L.Ed. 2d 448, 87 S.Ct. 597 (1966) (unlawful practice under New York law extends to advice involving federal antitrust law); *Perlah v. S.E.I. Corp.*, 29 Conn. App. 43, 612 A.2d 806, 808 (1992) (an attorney licensed only in New York who maintained a Connecticut office and whose services consisted primarily of assisting his clients in obtaining a controlling interest in a New York corporation was engaged in the unauthorized practice of law); *Taft v. Amsel*, 23 Conn. Supp. 225, 227, 180 A.2d 756, 757 (1962) (a New York attorney could not recover a fee for legal services relating to interstate transportation business rendered primarily in Connecticut to Connecticut residents); *Kennedy v. Bar Ass'n of Montgomery County, Inc.*, 316 Md. 646, 662-63, 561 A.2d 200, 208-09 (1989), and cases cited therein; *In re Roel*, 3 N.Y.2d 224, 229, 144 N.E.2d 24, 26, 165 N.Y.S.2d 31 (1957), *appeal dism'd* 355 U.S. 604 (1958); *Ranta v. McCarney*, 391 N.W.2d 161, 162 n.1, 164-66 (N.D. 1986).

Id. at 672-73. (emphasis added)

Additionally, in <u>Biller Associates v. Rte. 156 Realty Company</u>, 52 Conn.App. 18, 725 A.2d 398 (App. Ct. 1999), the Appellate Court held that a licensed public insurance adjuster may not collect a contingency fee as a lawyer it was disallowed a fee recovery. The Court stated:

> Because only an attorney admitted to the bar of this state can prosecute, negotiate and settle a negligence action on behalf of another party, only an attorney can obtain payment for the performance of the services. As a matter of law, therefore, the plaintiff, a public adjusting firm, was not entitled to recover in <u>quantum meruit</u> a percentage of the defendant's settlement from a negligence action.

Id. at 34.

As such, defendant/third-party plaintiff Michael A. Douglas should not be allowed to recover either the contingency fee portion and/or the hourly portion of his counterclaim/third-party claim because he was not a duly licensed Connecticut attorney. Moreover, this Court should hold that he is not entitled to any remuneration because he engaged in the unauthorized practice of law in Connecticut.

### POINT II

PLAINTIFF NORMAN C. BLOOM AND THIRD-PARTY DEFENDANTS NORMAN R. BLOOM REVOCABLE TRUST, NORMAN R. BLOOM FAMILY SPRAY TRUST, AND NORMAN R. BLOOM IRREVOCABLE INSURANCE TRUST'S EVIDENCE IS SUFFICIENT TO SUPPORT ITS MOTION FOR SUMMARY JUDGMENT; THE STANDARDS FOR SUMMARY JUDGMENT HAVE BEEN MET

The Supreme Court in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) stated that:

> Rule 56 must be construed with due regard not only for the rights of person asserting claims and defenses that are adequately based in fact to have these claims tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims have no factual basis.

Where, as here, no genuine issue of material fact exists, the trial courts have been encouraged by the Supreme Court to grant summary judgment motions in favor of the defendants. Further, the Supreme Court in <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986), stated that:

> ". . . to deny summary judgment there must be no genuine issue of material fact," noted that "[f]actual disputes that are irrelevant or unnecessary will not be counted." (emphasis in original)

Plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust have clearly introduced sufficient evidence to support their motion for summary judgment. As the Court stated in <u>DeLong Corporation v. Raymond International, Inc.</u>, 622 F.2d 1135, 1141-42 (3d Cir. 1980):

> ... we do not read Fed.R.Civ.P. 56 as requiring that the movant in a motion for summary judgment introduce evidence supporting its position beyond any doubt. Rather, it is sufficient if it submits evidentiary material which indicates there is "no genuine issue of material fact."

In the case of <u>Knight v. U.S. Fire Insurance Co.</u>, 804 F.2d 9, 11-12 (2d Cir. 1986), <u>cert. denied</u>, 480 U.S. 932 (1987), the Court of Appeals for the Second Circuit provided instructive comment concerning the use of Rule 56:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.

Anderson v. Liberty Lobby, Inc., ___ U.S. ___, 106 S.Ct. 2505, 2509-11, 91 L.Ed.2d 202 (1986); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985).

Before rendering summary judgment, a court must also determine that any unresolved issues are not material to the outcome of the litigation. "[T]he mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1983) (per curiam). Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Id. Similarly, a "bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discover, is not sufficient to defeat a motion for summary judgment." Eastway, 762 F.2d at 251.

\* \* \*

As the Supreme Court recently explained: Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." (emphasis ours)

## CONCLUSION

Based on the foregoing, plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust's Motion for Summary Judgment should be granted, and 1) the cross-claim against plaintiff Norman C. Bloom, and 2) the third-party plaintiff claims against the third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust should be dismissed.

Dated: Easton, Connecticut
December 5, 2003

LOVEJOY & ASSOCIATES
Attorneys for Plaintiff Norman C. Bloom and
Third-Party Defendants Norman R. Bloom
Revocable Trust, Norman R. Bloom Family Spray
Trust, and Norman R. Bloom Irrevocable Insurance
Trust

By: _____
Frederick A. Lovejoy (CT 03121)
276 Center Road
P.O. Box 56
Easton, Connecticut 06612
(203) 459-9941
(203) 459-9943 (telefax)

BloomSum-Judg.doc

## CERTIFICATION

This is to certify that a copy of the attached was mailed on December 5, 2003, postage prepaid, to:

George R. Ciampa, Esq.
Slavitt, Connery & Vardamis
618 West Avenue
Norwalk, Connecticut 06850

```
                                        _____
                                        FREDERICK A. LOVEJOY
```