# *United States District Court*

**DISTRICT OF**   CONNECTICUT

**NORMAN C. BLOOM,**
                               **Plaintiff**

                 **v**

                                                    **CASE NUMBER: 3:02CV907(PCD)**

**MICHAEL A. DOUGLAS**
                               **Defendant and Third
Party Plaintiff**

                 **v**
**NORMAN C. BLOOM, NORMAN R. BLOOM
REVOCABLE TRUST, NORMAN R. BLOOM
FAMILY SPRAY TRUST and NORMAN R.**      **APRIL 15, 2004**
**BLOOM IRREVOCABLE INSURANCE
TRUST**
                               **Third Party
Defendants**


### MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT

Defendant/third party plaintiff Michael A. Douglas ("Douglas") submits this memorandum,

with accompanying exhibits, in opposition to the motion for summary judgment filed by

plaintiff/third party defendants Norman C. Bloom, Norman R. Bloom Revocable Trust, Norman R.

Bloom Family Spray Trust And Norman R. Bloom Irrevocable Insurance Trust ("Movants").   On

this record, movants have failed to demonstrate that no material facts are in dispute and that they are

entitled to judgment as a matter of law.   Accordingly, the motion should be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This action relates to a contract for services first entered into in 1995.   Performance on that contract spanned the next seven years and the facts related thereto are voluminous.   For purposes of this motion, however, the relevant factual background is as follows:

**Michael A. Douglas:**

Defendant/third party plaintiff, Michael A. Douglas ("Douglas"), is a self-employed New York businessman.   (Exhibit A, Douglas Aff. ¶ 3).   For the past several decades, he has earned his living working in various business-related capacities.   In the 1980's, for example, he was involved in securing a multimillion dollar deal between Calvin Klein and M & G, Inc. for clothing imports. Between 1996 and 1998 he assisted his client Adamjee, a multinational conglomerate, in securing foreign distributorships for "Multiferon," a drug used in the treatment of Hepatitis C.   He has also been involved in real estate ventures in Florida.   He is currently assisting the coop where he resides in converting to condominiums.   From 1968 through 1984, Douglas was a teacher at St. Frances Xavier High School in Manhattan.   In 1968, he founded a driving school which is still successful. That school is now the only driving school in Manhattan using computerized simulators.

Douglas has been licensed to practice law in the State of New York since 1967.   Id. at ¶ 4.

Other than the transaction upon which this litigation is based, Douglas has never done business in Connecticut.   Id. at ¶ 5.   Although he lived in Connecticut from December 1993 to December of 1997, he never maintained an office, nor solicited business of any kind in this state.

**Douglas Meets Norman C. Bloom:**

Plaintiff Norman C. Bloom ("Norman C.") and Douglas became neighbors in December of 1993, when Douglas moved to 1 Seaside Place, E. Norwalk, Connecticut, across the street from Norman C.

Id. at ¶ 6.   Although they lived in close proximity, they did not formally meet until June, 1995.

Before that time, Douglas only knew of Norman C. because he had occasionally cleared snow from

the neighborhood walks.

In June, 1995, Norman C. approached Xin Wong, Douglas' fiancée, to request that she arrange a

meeting between him and Douglas. Id. at ¶ 6.   He had heard that Douglas was a businessman and an

attorney and was seeking advice regarding problems related to the disposition of his late father's

estate.   Shortly thereafter, Douglas agreed to meet with Norman C.   At that first meeting, Norman

C. explained that he felt that he was being cut out of a fair share in his father's estate.   Id. at ¶ 8.   He

explained that his father, Norman R. Bloom ("Norman R."), had died in 1989, leaving him and his

two brothers, Steven and Robert as heirs.   Norman R. left a huge estate including a one-half interest

in Tallmadge Brothers, Inc., a shellfish business he owned with his brother, Hillard Bloom, Sr.

("Hillard").   The assets were controlled by three trusts, the Norman R. Bloom Revocable Trust, the

Norman R. Bloom Family Spray Trust, and the Norman R. Bloom Irrevocable Insurance Trust.   For

each of the three trusts, there were three "subtrusts," one for each brother.

At the time of the June 1995 meeting, Hillard was negotiating to purchase Norman C.'s one-third

share of Norman R.'s estate.   Id. at ¶ 9,   Norman C. and Hillard, however, were not on good terms.

Norman C. felt Hillard was hiding estate assets and generally attempting to cut Norman C. out of his

fair share of his father's estate.   Prior to meeting Douglas, Norman C. had Hillard removed as trustee

related to the trusts to which Norman C. was a beneficiary, and replaced him with Westport Bank and

Trust Co.

There was no question that Norman C. was entitled to a one-third share of his father's estate.   Id.

at ¶ 10.   Rather, the central issues in those negotiations were the identification, location, valuation

and division of estate assets, including substantial real estate and Tallmage Brothers, Inc.

Valuation of Tallmage Brothers, and disposition of Norman C.'s one-sixth interest, was a

particularly complicated issue because of Hillard's control of the company and his refusal to disclose

the true extent and value of Tallmage Brothers assets.    At the time Norman C. approached Douglas

in June of 1995, attorney Richard Devinney, attorney for co-trustee Westport Bank and Trust Co.,

was representing Norman C.'s legal interests in the negotiations with Hillard.    Devinney was billing

the trusts for his legal services to Norman C.    Id. at ¶ 12.

**Douglas and Norman C. Enter Into First Consultation Agreement:**

At the June 1995 meeting, Norman C. stated that he did not believe Hillard and the other parties

involved were acting in good faith.    Id. at ¶ 13.    He was also becoming increasingly unhappy with

the manner in which Devinney and the trustee, Westport Bank and Trust, were handling the

negotiations.    Id.    Norman C. expressed that he wanted to be more aggressive in terms of

identifying and appraising the assets in Norman R.'s estate.    Id.

To that end, he began to solicit advice from Douglas.    Id. at ¶ 14.    For a few days, Douglas

spoke with Norman C. informally.    Id.    On each visit, Douglas advised Norman C. on the business

aspects of his case, but reminded Norman C. that he (Douglas) was not admitted to practice in

Connecticut and that if Norman C. wanted legal advice or representation, he should look to his

current legal advisor Devinney, or find other Connecticut counsel to represent him.

On the fourth night, Douglas told Norman C. that his issues were too time consuming and that

Douglas would no longer be able to help him.    Id. at ¶ 15.    Norman C. then offered to pay Douglas

for his services.    Douglas told Norman C. he would be willing to consult, but again informed him

that he was not licensed to practice law in Connecticut.    Norman C. would have to maintain legal

representation with a Connecticut attorney, who would be responsible for all issues implicating Connecticut law.   Norman C. indicated that he understood.

On June 19th, 1995, Douglas and Norman C. executed an document entitled "Agreement," whereby Douglas agreed to consult with Norman C. regarding the negotiations and to be paid on an hourly basis.   (Exhibit B).   The Agreement expressly states: "It is understood that Douglas role shall be that of Consultant, not attorney in these proceedings."   The ten hours of previous work indicated in that Agreement reflected the prior three nights of meetings.

From the time the Agreement was executed, Douglas served as a consultant to Norman C. primarily on issues related to the identification, location, and valuation of estate assets.   Id. at ¶ 17. Going forward, Douglas performed the following chores: he reviewed and organized voluminous documents collected in the six years since Norman R.'s death; he consulted Norman C. and his accountant Mark Ericco concerning letters they wrote to the attorney for co-trustee Westport Bank; he worked to obtain evaluations on various properties of the estate; he performed investigatory work as to location and value of estate assets; he assisted in obtaining local counsel to represent Norman C. on issues arising under Connecticut law.   Id. at ¶ 18.   Most of that work was performed in Douglas' New York office.   Id. at ¶ 19.

At all times between June of 1995 and March of 1996, Norman C. relied on attorney Devinney for all legal advice and representation.   Id. at ¶ 20.   At no time did Douglas perform any service that rests exclusively within the province of lawyers.   He did not provide legal advice; he did not draft legal documents; he did not appear in any legal proceeding on Norman C. Bloom's behalf.   At no time did he hold himself out to be Norman C.'s legal representative.

**Norman C. Replaces Devinney with Cohen and Wolf, P.C. as His Connecticut Counsel:**

In March of 1996, Norman C. hired new Conecticut Counsel, Cohen and Wolf, P.C., to represent his legal interests in the negotiations.   (Exhibit C).   Norman C. also requested that Douglas play a more active role in his capacity as a consultant.   To that end, in January of 1997, the parties executed a Second Amendment to the Agreement which kept the Agreement in effect, but specified that Douglas would henceforth participate in meetings between Norman C. and his Connecticut attorneys, accompany Norman C. to hearings, and participate with Norman C. and his Connecticut attorneys in the decision making process.   (Exhibit D).   The latter provisions were intended to reflect the growing importance of Douglas' role as a consultant in the case.

Subsequent to that time, Douglas continued to consult with Norman C. in substantially the same capacity.   (Exhibit A, Douglas Aff. ¶ 23).   He continued to assist him and his Connecticut attorneys in identifying, locating, and obtaining valuations for estate's substantial assets.   He also assisted in formulating a strategy to successfully divide the Tallmadge Brothers business, the most complicated issue in the negotiations.   As Robert Bloom's attorney noted at his deposition, the business issues related to Tallmadge Brothers dominated these negotiations:

> "Most of the discussions dealt with how we could make certain that Tallmadge Brothers was run economically and profitably and make certain that money wasn't stolen from the company.   So, what we really focused on in most of our conversations was the efficient operation of the company."

(Exhibit E, Zeisler Dep. pp. 16-17).

Douglas was one of several consultants who took an active role in the negotiations. (Exhibit A, Douglas Aff. ¶ 24).   Joseph Tessoriere, for example, worked with Robert Bloom and Richard Zeizler, Robert's attorney.   Like Douglas, Tessoriere actively participated in all meetings and attended many of the legal proceedings, providing Robert and his attorney with

advice regarding the business aspects of the case.    Similarly, the accountant Mark Errico

provided Norman C. and his attorneys with advice concerning the economic aspects of the case.

Much of Douglas' work was performed in New York.    Id. at ¶ 25.    Most telephone

conversations between Cohen and Wolf and Douglas were to or from his New York office. (Ex. Fp.

93 lines 8-20, p. 95 lines 1-9).    When Douglas commented on drafts and letters, he did so from his

office in New York. (Ex. A ¶ 25); (Ex. F p.95 lines 10-24 p. 94 lines 16-24).    Other of the many

services in New York included:    Douglas met with a handwriting expert at the request of both

Norman C. and Steven Bloom to determine whether Norman R.'s handwriting had been forged; he

met with the head of the Trust Department of Sterling National Bank; he spoke to New York

Immigration Attorney in New York about helping some of Norman C.'s employees; contacted

forensic detective firm in New York to track down missing money; he had a preliminary introduction

to a Connecticut real estate appraiser, who contacted Douglas in his New York office; attempted to

find drug treatment clinician for Steven Bloom (which Norman C. felt was essential to securing

Steven as an ally in the negotiations and on the Tallmadge Brothers board).    (Ex. A ¶ 26).

All the while, Douglas maintained his abstention from acting as Norman C.'s legal

representative.    (Ex. A ¶ 28).    Norman C. understood that he was to rely upon Cohen and Wolfe,

P.C., for all advice and decisions related to issues arising under Connecticut law.    Douglas never

signed a pleading nor attended a proceeding other than as spectator.    (Ex. F p. 101 lines 1-24, p. 102

lines 1-24).    Cohen and Wolf billed Norman C. for thousands of hours of attorney time, with at least

six attorneys working on the file during its representation. (Ex. F p. 106 lines 1-24).    Norman C.

knew "from day one" that Douglas could not act as his attorney in Connecticut.    (Ex. F p. 115 lines

1-7).

**Divisive Reorganization Agreement Resolves Tallmadge Brothers Issue:**

The division of Tallmadge Brothers was finally resolved in July, 2001 when Norman C. and his brothers executed a contract entitled Divisive Reorganization with the heirs of Hillard Bloom.[1] (Ex. A ¶ 30).   Briefly, that agreement called for a *de facto* division of Tallmadge Brothers, Inc. between the heirs of Norman R. and the heirs of Hillard Bloom.   Final division would be stayed pending approval by the IRS.   At Douglas' insistence, the Divisive Reorganization Agreement includes provisions for legal fees <u>and consulting fees</u>.   (Ex. A, Douglas Aff. ¶ 32); (Ex. G, Barker Dep. pp. 27-28).

Following execution of the Divisive Reorganization agreement, Cohen and Wolf terminated its representation agreement with Norman C. who, in turn, refused to pay their bill.   (Ex. A ¶ 33). Cohen and Wolf was forced to file suit to recover its fees. (Ex. F   p. 115 lines 8-24).   <u>See</u>, <u>Cohen & Wolf, P.C. v. Norman Bloom</u>, Docket No. CV02-0293585-S (J.D. Bridgeport).   Norman C. retained attorney Frederick Lovejoy to represent him in that action and with regard to outstanding issues concerning his father's estate. (Exhibit A, Douglas Aff. ¶ 34).

At Norman C.'s request, Douglas remained involved as a consultant until April of 2002. (Douglas Aff. ¶ 35). Until that time, Douglas assisted in resolving several outstanding matters. Having a relationship with both parties, Douglas encouraged Norman C. and Cohen and Wolf to resolve their fee dispute.   He urged parties to the negotiations to finalize approval of the Divisive Reorganization Agreement.   At Lovejoy's request, he provided a list of outstanding issues related to the negotiations over assets.   <u>Id</u>. at ¶ 36.   Lovejoy used that summary to bring a related action

---

[1] Hillard Bloom died while negotiations were still proceeding in 2001.

which is currently being arbitrated in Connecticut.   All work related to these matters was performed in Douglas' New York office.

Notwithstanding Douglas' performing these tasks at Norman C. and Lovejoy's insistence, he began to get feel they were planning means of avoiding payment.   His concerns were not unfounded. Unbeknownst to Douglas, Lovejoy expressed the intent to not pay Michael Douglas as early as fall of 2001, (Ex. F pp. 108 – 110), while continuing to encourage and accept his services.

Norman C. never aid anything but a fraction of his bill.   (Ex. A ¶ 37).   Instead, he filed the present action, alleging that some of Douglas' services constituted the "unauthorized practice of law in Connecticut" and seeking a Court determination that Douglas' substantial efforts are not to be compensated.

## II.    STANDARD FOR SUMMARY JUDGMENT

The principles governing consideration of summary judgment motions are well established. Summary judgment should be granted only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor.   See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996).   In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party.   Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).   Issues of credibility cannot be resolved in the context of a motion for summary judgment.   United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).   The moving party bears the

burden of demonstrating the absence of a genuine issue of material fact.   <u>Adickes v. S. H. Kress &</u> <u>Co.</u>, 398 U.S. 144, 157 (1970).

**III.    THERE ARE GENUINE ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFF THIRD PARTY DEFENDANT**

The movants premise their motion for summary judgment on the singular assertion that Douglas engaged in the unauthorized practice of law in Connecticut when providing services to Bloom.   They argue that since the unauthorized practice of law in Connecticut is non-compensable, Douglas may recover nothing for his substantial efforts.   For the same reason, they   contend they are entitled to reimbursement for previous payment.

The Motion for Summary Judgment does not entitle them to judgment as a matter of law since: 1) the "unauthorized practice of law" issue is not one appropriate for Summary Judgment; 2)   Douglas did not engage in the practice of law; 3) even if Douglas did "practice law" in Connecticut, which he did not, he is nonetheless entitled to compensation since Norman C. was at **all** times appraised of Douglas' unlicensed status in Connecticut and further was, at **all** relevant times, represented by Connecticut counsel who maintained authority on all issues implicating Connecticut law; 4) even if Douglas did engage in the practice of law, which is disputed, he did so at his place of business in New York, where he is fully licensed to practice law; and 5) even if some of Douglas' conduct might be construed as the unauthorized practice of law, he would still be entitled to recover for services that were not the practice of law, for which compensability can not contested.

**A.    The Issue is Inappropriate for Summary Judgment**

As an initial matter, the issue of whether Douglas' work for Norman C. constituted the practice of law is inappropriate for summary judgment since it is one to be tried to the factfinder.   <u>See</u>,

Robertson v. Town of Stonington, 253 Conn. 255, 750 A.2d 460 (2000) (noting that a "thorough inquiry by a fact finder is required" to determine whether a party's actions constitute the unauthorized practice of law); see also, Francorp, Inc. v. Siebert, 211 F. Supp.2d 1051 (N.D. Ill. 2002 (summary judgment not appropriate on issue of whether corporation was practicing law since "[a] fact finder will ultimately have to determine the extent of [corporation's] involvement in creating legal documents and whether those activities crossed the line from consulting into legal practice"). Where, as here, the inquiry is of a "fact-specific nature," summary judgment is inappropriate unless no reasonable factfinder could conclude in favor of the party opposing summary judgment. Amnesty America v. Town of West Hartford, 361 F.3d 113 (2nd Cir. 2004).

### B.     Douglas' Services Were Not The "Practice of Law"

Even if the Motion is confronted on its merits, the Court should have no trouble finding disputed material facts.

The law on unauthorized practice in Connecticut is vague, but well established.   An attorney "practicing law" in Connecticut must generally be admitted as an attorney in this state.   Conn. Gen. Stat. § 51-88(a).[2]   But "[a]ttempts to define the practice of law have not been particularly successful [because of the] broad field covered."   Statewide Grievance Committee v. Patton, 239 Conn. 251, 254, 683 A.2d 1359, 1361 (1996) (citations omitted).   "The more practical approach is to consider

---

[2] That statute, in relevant part, provides:
(a) A person who has not been admitted as an attorney under the provisions of section 51-80 shall not: (1) Practice law or appear as an attorney-at-law for another, in any court of record in this state, (2) make it a business to practice law, or appear as an attorney-at-law for another in any such court, (3) make it a business to solicit employment for an attorney-at-law, (4) hold himself out to the public as being entitled to practice law, (5) assume to be an attorney-at-law, (6) assume, use or advertise the title of lawyer, attorney and counselor-at-law, attorney-at-law, counselor-at-law, attorney, counselor, attorney and counselor, or an equivalent term, in such manner as to convey the impression that he is a legal practitioner of law, or (7) advertise that he, either alone or with others, owns, conducts or maintains a law office, or office or place of business of any kind for the practice of law.

each state of facts and determine whether it falls within the fair intendment of the term." <u>Id</u>.  The

decisive question in Connecticut is whether the acts performed were such as are "commonly

understood to be the practice of law." <u>State Bar Assn. v. Connecticut Bank & Trust Co.</u>, 145 Conn.

222, 236, 140 A.2d 863, 877 (1958); <u>Grievance Committee v. Payne</u>, 128 Conn. 325, 330, 22 A.2d

623, 626 (1941); <u>Patton</u> at 254, 683 A.2d 1359.

    The services Douglas provided to Norman C. were not such as are "commonly understood to be

the practice of law." <u>See</u>, <u>Connecticut Bank & Trust Co.</u> at 236, 140 A.2d at 877.  Connecticut

courts have long recognized that activities resembling the practice of law, incidental to a non-lawyers

primary business, do not qualify as the "practice of law in Connecticut."  Thus in <u>State Bar</u>

<u>Association v. Connecticut Bank and Trust Cop.</u>, 145 Conn. 222, 140 A.2d 863 (1958), the

Connecticut Supreme Court held that although banks could not use employees to draft legal

documents for clients, it could review and critique legal documents and disseminate general

information about Connecticut laws as incident to its principal business.  The Court emphasized that

the banks encouraged customers to seek their own counsel to address their particular legal needs. <u>Id</u>.

    Although there is somewhere a line between consulting and practicing law, Douglas' services

plainly fall short of that line.  As previously detailed, business, economic, and personal issues

dominated the dispute following Norman R.'s death.  The estate contained Norman R.'s interest in

substantial amounts of real estate, as well as his half interest in Tallmadge Brothers.  The

percentages as between each brother (Norman C., Robert, Steven) and as between the brothers and

Hillard Bloom were not in dispute.  The negotiations, rather, centered around how to identify, value,

and separate those assets among the parties so that each received an amount reflecting his respective

interest in the estate.    Moreover, Tallmadge Brothers had to be divided on some basis that would not, in the process, ruin the integrity of the company.    (Ex. A ¶ 23); (Ex. E pp. 16-17).

Douglas' job was to assist Norman C. and <u>Connecticut</u> <u>counsel</u> in locating substantial estate assets; securing valuations for those assts; and evaluating potential courses of action with regard to their impact on the Tallmadge Brother's business.    To that end he reviewed volumes of documents to identify and locate estate assets; performed further investigative work, including consulting forensic detectives, to locate assets which were potentially hidden; secured appraisers to evaluate estate assets; and generally provided advice to Norman C. and his Connecticut counsel on the best way to proceed <u>from a business perspective</u>.    He reviewed voluminous documentation, including legal documents, but did so for the purpose of identifying and locating assets in the estate.    Advice related to the legal implications of any documents was provided by Norman C.'s Connecticut counsel. Eventually Douglas took an active role in negotiations, but his input <u>always</u> related to economic and business aspects of the negotiations.    (Ex. E pp. 10-11).

None of those services were those exclusively within the province of attorneys.    Douglas did not "appear in court, prepare a pleading, give a paper to his client to sign or comment on Connecticut law in any way." (Ex. E pp. 30-31).    At each stage of the proceedings, he reminded Norman C. he was not licensed to practice in Connecticut, which Norman C. knew from "day one."    (Ex. F p. 115 lines 1-7); (Ex. A ¶ 15).    Connecticut counsel represented Norman C.'s interests at every stage of the underlying proceedings (Exhibit A).    Douglas would defer to Norman C.'s attorneys any time a legal issue arose. (Ex. E pp. 30-31); (Ex. A ¶ 28, 29).    It may be, as movants argue, that attorneys can perform many of these tasks.    But simply because an act is often performed by an attorney does not make that act "the practice of law."    <u>See</u>, <u>In re Darlene C.</u>, 247 Conn. 1. 15, 717 S.2d 1242, 1250

(1998) (Borden, J. concurring) (noting in context of abuse and neglect petitions that although lawyers routinely prepare and file such petitions, "[t]hat does not mean . . . that whenever someone files such a petition . . . that conduct invariably constitutes the practice of law.").

It is noteworthy that, in the <u>seven year</u> course of the underlying litigation, not a single Connecticut attorney raised the issue.    They understood Douglas' role.    Even Attorney DiMarco, who was Norman C.'s Connecticut counsel during most of the underlying proceedings, testified that his understanding was that Douglas was "to act as a business advisor, consultant . . .."    (Ex. F p. 14 lines 15-16, p. 77 lines 1-5).    DiMarco "drafted every document that was ever filed with any court and agreement."    <u>Id</u>. p. 79 lines 8-11.    In negotiating the Divisive Reorganization Agreement, DiMarco was in charge of "any actual negotiations."    <u>Id</u>. pp. 54-55.

Attorney Richard Zeisler, who represented Robert Bloom in the underlying proceedings, confirms DiMarco's testimony.    At his deposition, he described Douglas as a "consultant."    (Ex. E pp. 9-10). Zeisler attended many meetings at which Norman C., his Connecticut attorneys and Douglas were present. <u>Id</u>. at pp. 9-10.    He noted that Douglas "was involved in the economic side," and while Dimarco was in charge of the legal side of things, including courtroom strategy, Douglas' only input into the legalities of the estate was simply that "it had to get resolved."    <u>Id</u>. at pp. 10-11.    Although Douglas attended court proceedings, he would sit in the audience, not at counsel table.    <u>Id</u>. at p. 14. And in negotiating the Divisive Reorganization agreement, Douglas (along with Zeisler and DiMarco) gave only "business input," with attorney Zangari in charge of drafting the legalities. Id. at p. 15.

In their Motion, movants do not attempt to define the "practice of law."    Nor do they accuse Douglas of performing <u>any</u> of the acts heretofore held to be the practice of law.    In fact, rhetorical

flourishes removed, the entirety of plaintiff/third party defendants' claim rests on the following allegations[3]: that the initial Agreement between Douglas' and Norman C. contains the words "legal consultant" (Pl. Mem. p. 6); that certain billing statements from Douglas to Bloom purport to charge for "legal services" (Pl. Mem. p. 6); that Douglas attended meetings related to the underlying estate dispute (Pl. Mem. p. 6); that Douglas made phone calls related to the underlying dispute (Pl. Mem. p. 6); and that Douglas took part in negotiations related to the underlying dispute (Pl. Mem. p. 6). Not one of those allegations proves that Douglas "practiced law."

The first two allegations refer to written references to "legal services." The Court's inquiry, however, focuses not on what the services were called, but rather on the <u>acts</u> alleged to be the unauthorized practice of law. <u>Patton</u> at 254, 683 A.2d 1359 (the decisive question is whether the "acts performed" are commonly understood to be the practice of law). Thus movants may show that Douglas practiced law only by evidence of <u>acts</u> that are generally understood to constitute such practice. <u>Id</u>.

Where movants <u>do</u> describe Douglas' acts, they do not describe the "practice of law." They state, for example, that attorneys involved in the Bloom estate dispute attended meetings at which Douglas was present and conducted telephone call to which Douglas was a party. (Pl. Mem. p. 6). Interestingly, movants <u>do not</u> describe what Douglas <u>did</u> at those meetings nor what he <u>said</u> during those calls. <u>Id</u>. That omission exists because an accurate description of Douglas' activities would confirm that he did not practice law. Attorneys Zeisler and DiMarco, whose depositions plaintiff/third party defendants cite, <u>both</u> confirm this fact.

---

[3] Defendant respectfully urges the Court to note the difficulty in isolating exactly upon which facts plaintiff/third party defendants rely because their Memorandum in several places refers to entire depositions or entire sets of discovery responses, without drawing upon any particular fact therein (Pl. Mem. p. 7-8) and many assertions cite no evidence at all.

In an attempt to prove Norman C. was "without counsel" for a period, movants reference a September 17, 2001 letter from Douglas to Siegel, Connor, Schiff & Zangari, P.C. indicating that Cohen and Wolf, P.C. had withdrawn from the case and that the firm should deal with Douglas "until further notice."   (Pl. Exhibit E).   Plaintiff/third party defendants fail to note, however, that attorney Reynolds Gordon was still active in the case as Norman C's Connecticut counsel.   (Ex. A ¶ 27).   They also fail to note that attorney Lovejoy was becoming actively involved, though not yet formally retained.   Id. at ¶ 34.   Again, they fail to describe any act by Douglas that constituted the practice of law.

Movants' Exhibit K, which they cite as evidence that Douglas "was providing legal services" proves nothing.   That document appears to be part of a memorandum from Douglas to Norman C's Connecticut counsel, Richard DiMarco of Cohen and Wolf.   If anything, the document simply shows that Douglas recognized Cohen and Wolf's authority on all Connecticut legal issues.   Moreover, the "request for legal fees" to which plaintiff/third party defendants refer is not that at all.   On page two of the document, Douglas requests that DiMarco seek "legal fees" for Cohen and Wolfe, Douglas and Murphy.   (Pl. Exhibit K).   This statement cannot mean that fees should be sought for "the practice of law," since Murphy refers to an appraiser (not an attorney) who assessed the value of Tallmadge Brothers.

Movants also refer to "memoranda authored by defendant/third-party plaintiff Michael A. Douglas" as evidence that he practiced law.   But they do not include any "memoranda" as exhibits, so it is impossible to evaluate this claim.

Finally, movants state that "defendant/third-party plaintiff Michael A. Douglas was included in attorney-client privileged meetings."   They do not, however, cite to any exhibit, affidavit, or other

form of evidence to support this allegation.   Moreover, as before, they do not point to any <u>act</u> by

Douglas that might constitute the practice of law.   Simply attending meetings is not the practice of

law.   Moreover Douglas never attended meetings without Norman C.'s Connecticut counsel present,

and never gave input on anything other than the business or economic aspects of the case.

In short, movants have not begun to prove that Douglas engaged in the practice of law.   They

<u>certainly</u> have not shown the absence of disputed issues of material fact on the subject.

Accordingly, summary judgment should be denied. <u>See</u>, <u>Francorp, Inc. v. Siebert</u>, 211 F. Supp.2d

1051 (N.D. Ill. 2002 (summary judgment not appropriate on issue of whether corporation was

practicing law; where plaintiff disputed description of services as "unauthorized practice" and

division of responsibility between plaintiff and actual attorneys was in dispute).

### C.    Even If Douglas Practiced Law, His Services Were Compensable Since He Disclosed His Out-of-State Status and Associated With Local Counsel

Plaintiff and third party defendants correctly state the hornbook rule that an attorney licensed in

one state, <u>generally</u>, may not recover for legal services provided in another state.   (Pl. Mem. pp. 8-

10.).

But that tenet is only part of the puzzle.   Recognizing the realities of modern, multistate practice,

and the harshness of such a bright line, courts have consistently permitted out-of-state attorneys to

recover fees where, as here, the attorney fully discloses his unlicensed status locally and associates

himself with local counsel.[4]   <u>See</u>, e.g., 11 ALR3d 907 (2004) (noting the "line of cases and general

---

[4]  In order to blunt the harshness of the general rule, Courts have also developed other exceptions.   Courts have held, for example, that an out-of-state attorney may recover for service provided in-state on issues of federal law, <u>See</u>, <u>Spanos v. Skouras Theatres Corp</u>., 364 F.2d 161 (2d Cir. 1966) (federal antitrust claim);<u>Western Life Ins. Co. v. Nanney</u>, 296 F. Supp. 432, 440 (E.D. Tenn. 1969); and on issues involving

rule holding that an attorney who is a member of the bar of one state may recover for the reasonable

value of legal services rendered in a state in which he is not a member of the bar when he has not

held himself out as a member of the latter state's bar, and has associated himself with local

counsel'."); *see also*, 7 Am. Jur.2d Attorneys at Law §259 (2003) ("[A]n out-of-state attorney may be

allowed compensation for local services, even though he or she is not admitted locally where, prior to

the rendition of the services, the attorney makes a full disclosure to the client of his or her lack of

local license and does not conceal or misrepresent the true facts.");    ABA Committee on Ethics and

Professional Responsibility, Formal Op. 316 (1967) (attorneys may associate themselves with

attorneys from another state so long they do not mislead the client as to their authority; such

arrangements "permit the profession to face up to the problems of interstate metropolitan area and

interstate business activities, as well as permitting the public to be served in an adequate way").

     Although Connecticut courts have never faced this issue directly, Supreme Court decisions

from other states demonstrate the wisdom of the exception:

> [The rule] that an attorney licensed in one state may recover for services rendered in a
> state in which he is not duly licensed, if he initially discloses that fact to his client and
> further informs him of the necessity to associate with local counsel [is one[ which, in all
> fairness, we feel impelled to adopt.   We find that such an interpretation is better suited to
> the modern practice of law and in the interests of promoting comity between the states . .
> . Under these circumstances, neither the spirit nor the intent of [laws] regulating the right
> to practice law in this state, has been violated.

Winer v. Jonal Corporation, 169 Mont. 247, 252 545 P.2d 1094, 1097 (1976).   *See also*, Brooks v.

Volunteer Harbor No. 4, 233 Mass. 168, 123 N.E. 511 (1919) (attorney, though unlicensed in

Massachusetts, could recover fees for legal services performed in that state where he did not hold

himself out as a Massachusetts attorney, informed client that he was not licensed to practice in State,

---

arbitration: Williamson, P.A. v. John D. Quinn Constr. Corp., 537 F. Supp. 613, 616 (S.D.N.Y. 1982) (New

and notified client that it would be necessary to obtain local counsel); <u>Lindsey v. Ogden</u>, 10 Mass.

App. Ct. 142, 406 N.E.2d 701 (1980) (rejecting argument that attorney licensed in New York

engaged in unauthorized practice of law in Massachusetts since attorney "never held himself out as a

Massachusetts lawyer, never drew any documents in Massachusetts, and never did anything else that

would be considered the practice of law in this state."); <u>Somuah v. Flachs</u>, 352 Md. 241, 262,   721

A.2d 680, 690 (1998) (permitting out of state attorney's *quantum meruit* claim and emphasizing that

attorney "did not and does not have a Maryland office, and he did not engage in any advertising or

solicitation that led to his introduction to Petitioner."); ABA, Model Rules of Professional Conduct,

Annotated p. 457 (noting that one option to avoid violating unauthorized-practice law prohibition is

to associate with counsel in the foreign jurisdiction).

In <u>Freeling v. Tucker</u>, 49 Idaho 475, 289 P. 85 (1930), the Idaho Supreme Court permitted

compensation under circumstances far more extreme.   There an out-of-state attorney was hired to

represent the defendant's interest as an heir of a recently deceased relative.   The attorney studied

Idaho probate laws, and in fact made appearances on the defendant's behalf in Idaho probate court.

As in the present case, the defendant refused to pay her bill, and argued at trial that she owed

the attorney nothing since he was not licensed to practice in Idaho.   Rejecting that argument, the

Court emphasized as follows:

> It is not contended the contract in suit was invalid where made, that respondent falsely
> represented himself to be an attorney or that there was any deception on the part of the
> respondent as to his authority to practice as an attorney.   No objection appears to have
> been made to respondent's appearance in the probate court . . . which constituted but a
> portion of the performance of his contract with appellant.

<u>Id</u>. at 86.

---

Jersey attorney could recover fees earned in connection with New York arbitration proceedings).

The Court also emphasized that statutes prohibiting the unauthorized practice of law are aimed at persons holding themselves out as qualified practice law without the proper credentials. Id. It distinguished the case before it, noting that the attorney "has not offended the spirit or intention of these statutes." Id.

In the present case, plaintiff/third-party defendants do not, and cannot assert that Norman C. was anything other than fully informed about Douglas' status as unlicensed in Connecticut. Norman C.'s Connecticut counsel has testified that he knew this fact from "day one." Douglas repeatedly reminded Norman C. that he was not a Connecticut attorney, and took lengths to ensure that their Agreement provided that he would not act as Norman C.'s attorney in the underlying proceedings. Moreover, at all times Norman C. maintained Connecticut counsel who remained responsible for issues implicating Connecticut law.

To disallow compensation for services under these circumstances would permit Norman C. an enormous windfall, while doing nothing to contribute to the goals of the prohibition on unauthorized practice of law. The purpose of unauthorized practice statutes is to secure competent legal advice for the client. See, Restatement (3rd) The Law Governing Lawyers, § 4 cmt b.(1998). That goal is accomplished when an attorney discloses his out-of-state status, and ensures that the client has local representation responsible for all issues implicating law. See, Dietrich Corp. v. King Resources Co., 596 F.2d 422, 426 (10th Cir. 1979) (noting that when an attorney consults with a local law firm, his services are technically no different than those of an unlicensed law clerk or paralegal and are not unauthorized). The alternative is to unjustly forfeit a fairly earned fee.[5]   See, Phillips, Pamela and

---

[5]  Fee forfeiture is a particularly harsh remedy that would not be proportionate under the circumstances even if movants were correct. See, Restatement (3rd) Law Governing Lawyers § 37 cmt. b (2000) (noting that "[f]orfeiture of fees . . . is not justified in each instance in which a lawyer violates a legal duty, nor is total

SeLegue, Sean, "Rules Regulating Attorneys Handling Out-of-State Matters Are Often Outdated," 20 National Law Journal vol. 15 p B4 (December 8, 1997) (noting that permitting an out-of-state attorney to recover fees for in-state service unless he violated local ethical cannons "would avoid the unfairness of allowing a client to refuse to pay the lawyer solely because of the attorney's lack of a local license, even though the client was aware of that fact").

Perlah v. S.E.I. Corporation, 29 Conn. App. 43, 612 A.2d 806 (1992), upon which movants primarily rely is a very different case.   The attorney there clearly held himself out as a Connecticut attorney, maintaining an office and soliciting clients within the state of Connecticut.   See, Somuh v. Flachs, 352 Md. 241, 721 A.2d 680 (1998) (distinguishing Perlah on the grounds that the Perlah attorney maintained an office in a state in which he was not licensed).   Moreover, unlike the case at bar, the Perlah attorney never secured local counsel to represent the client on issues of Connecticut law, nor did he perform the lion's share of his services in New York, where he was licensed.   Thus, even if Douglas had practiced law in Connecticut, which he did not, his conduct would be nothing like that of the attorney in Perlah.

Taft v. Amsel, 23 Conn. Supp. 225, 180 A.2d 756 (Conn. Super. 1962) and In re Peterson, 163 B.R. 665 (B.R. Conn. 1994) are similarly distinguishable.   The attorney in Taft, prior to obtaining a Connecticut law license, actually formed a corporation in Connecticut and, as in Perlah, neither informed the "clients" of his unlicensed status nor associated with local counsel.   The attorney in Peterson, though only licensed in New York, had his only law office in Connecticut, solicited business in Connecticut from Connecticut clients, prepared pleadings in Connecticut, and

---

forfeiture always appropriate. Some violations are inadvertent or do not significantly harm the client . . . Denying the lawyer all compensation would sometimes be an excessive sanction, giving a windfall to a client.").

issued stationery that listed his Connecticut office.    Apparently, he did not even practice in New York.    The Peterson Court specifically noted that the attorney "did not consult with Connecticut-licensed counsel in rendering advice on matters of Connecticut law," Peterson at 673, and that he held himself out in Connecticut to provide legal advice to "all comers." Id. at 675.

Thus, the Perlah, Taft and Peterson courts made their decisions without the benefit of briefing or argument on any of the circumstances favoring compensation in the present case.    Even assuming Douglas practiced law, which he did not, he had no have an office in Connecticut, he did not solicit business in Connecticut or from Connecticut clients, he did not prepare pleadings in Connecticut or anywhere else, he did not form a Corporation in Connecticut, he did not appear as counsel in any Connecticut Court.    Moreover, unlike any attorney in Perlah, Taft or Peterson, Douglas insisted that Norman C. always had Connecticut counsel, and made his unlicensed status known from the very beginning.

Because Douglas was, at all times, associated with Connecticut counsel, and because Norman C. enlisted Douglas' assistance with full knowledge that Douglas was licensed only in New York, none of the dangers of Connecticut's unauthorized practice statute are implicated.    Accordingly, his services are compensable even if construed to be the practice of law.

### D.    The Services Douglas Provided Were Not Practicing Law In Connecticut

Even if plaintiff/third party defendants were correct in asserting that by writing letters, reviewing and organizing documents and making phone calls, Douglas engaged in the practice of law, his services would nonetheless be compensable since he performed much of those tasks in New York, where he is fully licensed.

Plaintiff/third-party defendants do not cite a single case supporting the proposition that a New York attorney may not be compensated for legal services performed in his New York office, though they relate to a Connecticut matter.    The law is, rather, the opposite.    Recognizing that "[m]ultistate relationships are a common part of today's society," courts have sensed the need to deal with those relationships "in a commonsense fashion."    Estate of Waring, 221 A.2d 193, 197 (N.J. 1966); ABA Committee on Ethics and Professional Responsibility, Formal Op. 316 (1967).

Thus, attorneys are permitted to conduct activities in their home state, even on issues implicating laws or proceedings in other states:

> Some activities are clearly permissible.    Thus, a lawyer conducting activities n the lawyer's home state may advise a client about the law of another state, a proceeding in another state, or a transaction there, including conducting research in the law of the other state, advising the client about the application of that law, and drafting legal documents intended to have legal effect there.    There is no *per se* bar against such a lawyer giving a formal opinion based in whole or in part on the law of another jurisdiction . . . It is also clearly permissible for a lawyer from a home-state office to direct communications to persons and organizations in other states (in which the lawyer is not separately admitted), by letter, telephone, telecopier, or other forms of electronic communication.

Restatement (3rd) The Law Governing Lawyers § 3 cmt. (2001)[6]; see also, Kellett v. Dolin, 1999 WL 814364 (D. N.H. May 28, 1999) (plaintiffs did not show that attorney who had advised client in New York, knowing client would act on that advice in New Hampshire, had engaged in the unauthorized practice of law in New Hampshire); El Gemayel v. Seaman, 533 N.E.2d 245 (N.Y. 1988) (attorney and expert in Lebanese law could call and write client from DC office and, while traveling in

---

[6]  The Restatement provides two helpful examples.    See, Restatement (3rd) The Law Governing Lawyers § 3 Ill. 1 (2001) (indicating that it is permissible for attorney whose office is in State A but near border with State B to represent State B residents from office in State A even where work requires research on issues implicating laws of State B); Id. Ill. 5 (permissible for attorney licensed in State A, introduced to client in State B, agrees to draft estate arrangement for client, returns to State A, conducts legal research in State A, consults by telephone with client in state B, returns to State B with documents to execution by client and witnesses).

Massachusetts, give New York client advice about enforceability of Massachusetts custody decree in Lebanon); <u>Lindsey v. Ogden</u>, 10 Mass. App. Ct. 142, 406 N.E.2d 701 (1980) ("A Massachusetts domiciliary is free to consult a licensed New York attorney on the merits of her estate plan."); <u>Lamb v. Jones</u>, 202 So.2d 810, 815 (Fla. Dist. Ct. App. 1967) (South Carolina attorney could recover fees for services performed in Florida and Alabama where, over four year period, he advised her regarding stocks and trusts, prepared will and trust agreement, but did not appear in court).

The Hawaii Supreme Court recently confronted this issue in <u>Fought & Co. v. Steel Eng'g and Erection, Inc</u>., 951 P.2d 487 (Haw. 1998).   There, a company doing business in Hawaii consulted with its Oregon counsel while using Hawaii counsel as its in-state representative.   Although the proceedings were in Hawaii, the company's Oregon counsel consulted with the Hawaii counsel regarding an appeal in Hawaii, prepared a position paper for mediation, assisted Hawaii counsel with legal research, reviewed and analyzed documents related to the Hawaii litigation, and analyzed papers submitted by other parties in the litigation, all from its Oregon office.

The Court held that the Oregon attorney's fees were recoverable.   In doing so, it emphasized that the realities of modern society require a flexible approach to the unauthorized practice prohibition:

> While the scope of theses statutes must be expansive enough to afford the public needed protection from incompetent legal advice and counsel, the transformation of our economy from a local to a global one has generated compelling policy reasons for refraining from adopting an application so broad that a law firm, which is located outside the state . . . may automatically be deemed to have practiced law 'within the jurisdiction' merely by advising a client regarding the effect of Hawaii law or by 'virtually entering' the jurisdiction on behalf of a client via 'telephone, fax, computer, or other modern technological means.

<u>Id</u>. at 47, 951 P.2d 487 (citations omitted).

In the present case, even if movants can show that Douglas was practicing law, he should nonetheless recover since the vast majority of his work was performed in New York.    Most telephone conversations between Cohen and Wolf and Douglas were to or from his New York office. (Ex. F p. 93 lines 8-20, p. 95 lines 1-9).    When Douglas commented on drafts and letters, he did so from his office in New York. (Ex. A ¶ 25); (Ex. F p.95 lines 10-24 p. 94 lines 16-24).    Many more services were performed in New York, including dealing with a handwriting expert; meeting with the Trust Department of Sterling National Bank; speaking with a New York Immigration Attorney; contacting forensic detectives; organizing real estate appraisers; and finding substance abuse treatment for Norman's brother Steven.

Accordingly, Douglas' services were compensable.

E.    **Even If The Court Were to Find That Douglas Practice Law in Connecticut, And That Such Services Were Not Compensable, Douglas Would Nonetheless Be Entitled To Compensation For Non-Legal Services**

Finally, Summary Judgment is inappropriate because even if the Court were to accept plaintiff/third party defendants' argument that some of Douglas' activities constituted "the practice of law," Douglas would still be entitled to compensation for services that were not the practice of law. Accordingly, a trial would still be necessary to determine which activities were compensable. Perlah, 29 Conn. App. At 48, 612 A.2d at 809 (remanding the case for a determination of compensation to be awarded for services that were compensable).    There is no case which holds that a single act of unauthorized practice of law disentitles a service provider to all fees earned during a seven year relationship with a client.

**IV.  Conclusion**

Because there is sufficient evidence that Douglas may be legally compensated for his

services, the Motion for Summary Judgment should be denied.

RESPECTFULLY SUBMITTED,

THE DEFENDANT/THIRD PARTY PLAINTIFF,
MICHAEL A. DOUGLAS

BY_____
  Ira B. Grudberg (ct00178)
  Joshua D. Lanning (ct24529)
 Jacobs, Grudberg, Belt & Dow, P.C.
  350 Orange Street
  New Haven, CT 06511
  Telephone:   (203) 772-3100
  Facsimile:   (203) 772-1691

<u>CERTIFICATION</u>

I hereby certify that a copy of the Memorandum in Opposition to Summary Judgment was mailed first class, postage prepaid on 4/15/04 to:

Frederick A. Lovejoy, Esq.
Lovejoy & Associates, LLC
P.O. Box 56
Easton, CT 06612-1604

_____
Joshua D. Lanning