# EXHIBIT A

# United States District Court

DISTRICT OF   CONNECTICUT

NORMAN C. BLOOM,
       Plaintiff

v                                                     CASE NUMBER: 3:02CV907(PCD)

MICHAEL A. DOUGLAS
       Defendant and Third Party Plaintiff

v
NORMAN C. BLOOM, NORMAN R. BLOOM
REVOCABLE TRUST, NORMAN R. BLOOM
FAMILY SPRAY TRUST and NORMAN R.      APRIL 15, 2004
BLOOM IRREVOCABLE INSURANCE
TRUST
       Third Party Defendants

### AFFIDAVIT OF MICHAEL A. DOUGLAS

1  I am the defendant, and third party plaintiff in the above action

2  I make this Affidavit in support of my opposition to plaintiff/third-party defendants' Motion Summary Judgment dated December 5, 2003

3  I am a self-employed New York businessman. For the past several decades, I have earned my living working in various business-related capacities  In the 1980's, for example, I was

involved in securing multimillion dollar deal between Calvin Klein and M & G, Inc. for clothing imports. In 1996 through 1998 I assisted my client Adamjee, a multinational conglomerate, in securing foreign distributorships for "Multiferon," a drug used in the treatment of Hepatitis C. I was also involved in real estate ventures in Florida. I am currently assisting the coop where I currently reside in converting to condominiums. From 1968 through 1984, was a teacher at St. Frances Xavier High School in Manhattan. In 1968, I founded a driving school which is still successful. That school is now the only driving school in Manhattan using computerized simulators.

4. I have been licensed to practice law in the State of New York since 1967. My record for attorney ethics is spotless. I have never been disciplined by the judicial authority of New York, or any other state.

5. Other than the transaction upon which this litigation is based, I have never done business in Connecticut. Although I lived in Connecticut from December 1993 to December of 1997, I have never maintained an office, nor solicited business of any kind in this state

6. The plaintiff, Norman C. Bloom ("Norman C.") and I became neighbors in December of 1993, when I moved to 1 Seaside Place, E. Norwalk, Connecticut, across the street from Norman C. Bloom. Although we lived in close proximity, we did not formally meet until June of

2

1995. Before that time, I only knew of Bloom, who had occasionally cleared snow from the neighborhood walks

7. In June of 1995, Norman C. approached Xin Wong, my fiancée, to request that she organize a meeting between Norman C. and myself. He had heard that I was a businessman and an attorney and was seeking advice regarding problems related to the disposition of his late father's estate. Shortly thereafter, I agreed to meet with Norman C. as a neighbor's courtesy.

8. At our meeting, Norman C. explained that he felt that he was being cut out of a fair share in his father's estate. He explained that his father, Norman R. Bloom ("Norman R."), had died in 1989, leaving him and his two brothers, Stephen and Robert as heirs. Norman R. Bloom left a valuable estate including a fifty percent (50%) interest in Tallmadge Brothers, Inc., the shellfish business he owned with his brother, Hillard Bloom, Sr. ("Hillard") The assets were controlled by three trusts, the Norman R. Bloom Revocable Trust, the Norman R. Bloom Family Spray Trust, and the Norman R. Bloom Irrevocable Insurance Trust. For each of the three trusts, there were three "subtrusts, one for each brother.

9. At the time of the June 1995 meeting, Hillard was negotiating to purchase Norman C.'s one-third share of Norman R.'s estate. Norman C. and Hillard, however, were not on good terms. Norman C. felt that Hillard was hiding estate assets and generally attempting to cut Norman C. out of his fair share of his father's estate. Prior to our meeting, Norman C. had had

3

Hillard removed as trustee related to the trusts to which Norman C. was a beneficiary, and replaced with Westport Bank and Trust Co

10. There was no question that Norman C. was entitled to a one-third share of his father's estate. Rather, the central issues in those negotiations were the identification, location, valuation and division of estate assets, including substantial real estate and Tallmage Brothers, Inc., the shellfish business.

11  Valuation of the Tallmadge Brothers business, and disposition of Norman C.'s one-sixth interest, was a particularly complicated issue because of Hillard Bloom's control of the company and his refusal to disclose the true extent and value of Tallmadge Brothers assets

12. In June of 1995, attorney Richard Devinney, attorney for co-trustee Westport Bank and Trust Co., was representing Norman C. Bloom's legal interests in the negotiations with Hillard  Devinney was billing the trusts for his legal services to Norman C. Bloom.

13. At the June 1995 meeting, Norman C. stated that he did not believe that Hillard and the other parties involved were acting in good faith. He was also becoming increasingly unhappy with the manner in which Devinney and the trustee, Westport Bank and Trust, were handling the negotiations. Norman C. expressed that he wanted to be more aggressive in terms of identifying and appraising the assets in Norman R.'s estate.

4

14. To that end, he began to solicit my advice. For a few days, I spoke with Norman C. informally. On each visit, I advised Norman C. on the business aspects of his case, but reminded him that I was not admitted to practice in Connecticut and that if Norman C. wanted legal advice or representation, he should look to his current legal advisor Devinney, or find another Connecticut attorney to represent him

15. On the fourth night, I told Norman C. that his issues were too time consuming and that I would no longer be able to help him. At that point, Norman C. offered to pay me for my consulting services. I told Norman C. that I would be willing to consult, but again informed him that I was not licensed to practice law in Connecticut. Norman C. would have to maintain legal representation with a Connecticut attorney, who would be responsible for all issues implicating Connecticut law. Norman C. indicated that he understood.

16. On June 19th, 1995, we executed an agreement entitled "Agreement" that formalized our arrangement.

17. From the time the Agreement was executed, I served as a consultant to Norman C. primarily on issues related to the identification, location, and valuation of estate assets.

18. During that time I performed the following work: reviewed and organized voluminous documents collected in the six years since Norman R.'s death in 1989; consulted Norman C. and his accountant Mark Ericco in letters they wrote to Richard Devinney (attorney for co-trustee

Westport Bank); attempted to get evaluations on various properties of the estate; performed investigatory work as to location and value of estate assets; assisted in obtaining local counsel to represent Norman C. on issues arising under Connecticut law.

19. Most of this work was performed in my New York office.

20. At all times from June of 1995 until March of 1996, Norman C. relied on attorney Devinney for all legal advice and representation. At no time did I perform any service that rests exclusively within the province of lawyers. I did not provide legal advice; I did not draft legal documents; I did not appear in any legal proceeding on Norman C. Bloom's behalf. At no time did I hold myself out to be Norman C.'s legal representative.

21 In March of 1996, Norman C. replaced his Connecticut counsel, hiring Cohen and Wolf, P.C. to represent his legal interests in the negotiations. Norman C. also requested that I play a more active role in my capacity as a consultant.

22 To that end, we executed a Second Amendment to the Agreement which kept the Agreement in effect, but specified that I would henceforth participate in meetings between Norman C. and his Connecticut attorneys, accompany Norman C. to hearings, and participate with Norman C. and his Connecticut attorneys in the decision making process.

23. Subsequent to that time, I continued to consult with Norman C. in substantially the same capacity. I continued to assist Norman C. and his Connecticut attorneys in identifying,

locating, and obtaining valuations for estate's substantial assets. I also assisted in formulating a strategy to successfully divide the Tallmadge Brothers business, the most complicated issue in the negotiations

24. I was one of several consultants who took an active role in the negotiations. Joseph Tessoriere, for example, worked to Robert Bloom and Zeizler, Robert's attorney Like me, Tessoriere actively participated in all meetings and attended many of the legal proceedings, providing Robert and his attorney with advice regarding the business aspects of the case. Similarly, Mark Errico provided Norman C. and his attorney's with advice concerning the economic aspects of the case.

25. Much of my work was performed in New York I conducted all telephone conferences with Cohen and Wolf, or anyone else from my New York office All paperwork was also reviewed in my New York office.

26. There were many further services: I met with a handwriting expert in New York at the request of both Norman C. and Steven Bloom to determine whether Norman R.'s handwriting was forged; I met with head of Turst Department of Sterling National Bank in New York in an attempt to get Robert and Steven New Trustees again at the behest of Norman C.; I spoke to New York Immigration Attorney in New York about helping some of Norman C.'s employees; I contacted forensic detective firm in New York to track down missing money; I had preliminary

7

introduction to Ct real estate appraiser who contacted me in my New York office; I attempted to find drug treatment clinician for Steven Bloom (which Norman C. felt was essential to securing Steven as an ally in the negotiations and on the Tallmadge Brothers board).

27  In December of 2000, Norman C. retained Ren Gordon to supplement Cohen and Wolfe's efforts in the negotiations. Ren Gordon was still representing Norman C. when my services were terminated in April of 2002.

28. All the while, I maintained my abstention from acting as Norman C.'s legal representative. Norman C. understood that he was to rely upon Cohen and Wolfe, P.C., for all advice and decisions related to issues arising under Connecticut law.

29. I never signed a pleading nor attended a proceeding other than as spectator.

30. The division of Tallmadge Brothers was finally resolved in July of 2001 when Norman C., Steven Bloom, Robert Bloom, and the heirs to Hillard Bloom executed a contract entitled Divisive Reorganization.

31  Briefly, that agreement called for a *de facto* division of Tallmadge Brothers, Inc. segregated between the heirs to Norman R. and the heirs to Hillard Bloom  Final division would be stayed pending approval by the IRS.

32. At my insistence, the Divisive Reorganization Agreement includes provisions for legal fees <u>and consulting fees</u>. The provision for attorney's fees was intended to protect Cohen and Wolfe's bill, the provision for consulting fees was intended to protect mine.

33. Following execution of the Divisive Reorganization agreement, Cohen and Wolf terminated its representation agreement with Norman C. who, in turn, refused to pay their bill. Cohen and Wolf was forced to file suit to recover its fees.

34 Norman C. retained attorney Frederick Lovejoy to represent him in that action and in regard to outstanding issues concerning his father's estate.

35 At Norman C.'s request, I remained involved as a consultant until April of 2002 Until that time, I assisted in resolving several outstanding matters. Having a relationship with both parties, I encouraged Norman C. and Cohen and Wolf to resolve their fee dispute. I urged parties to the negotiations to finalize approval of the Divisive Reorganization Agreement.

36. At Lovejoy's request, he provided a list of outstanding issues related to the negotiations over assets. Lovejoy used that summary to bring a related action which is currently being arbitrated in Connecticut. All work related to these matters was performed in my New York office.

37. Since our initial consultations in June of 1995, I have spent over four thousand hours over seven years working with Norman C. towards resolution of these issues. Norman C. however, has paid only a fraction of the agreed upon fees.

_____
Michael Douglas

Subscribed and sworn to before me this 13th day of April, 2004

_____
Comm. Sup. Ct.

# EXHIBIT B

# AGREEMENT

AGREEMENT between Norman C. Bloom residing at 3 Fifth Street, East Norwalk, Connecticut, hereinafter known as "Bloom" and Michael A. Douglas, attorney licensed to practice in the state of N.Y with office at 13 E 16 Street, N.Y. N.Y. Hereinafter known as "Douglas" agree to the following:

1. That "Bloom" is an heir to his father's estate. His father Norman R. Bloom died in October 22, 1989 and probate proceeding currently is going on in the district of Norwalk Connecticut.

2. That while the proceedings has been going on "Bloom" has not retained satisfactory probate council but has instead relied on the council for the trustee of the various trusts to represent his various interests within and without the estate.

3. It is the intention and desire of "Bloom" that it would be in his best interest to have his own legal consultant whose duties would be the following:
   a) To review all documents since the inception, i.e. wills, codicils, trust documents, correspondence, probate papers, tax documents, etc.
   b) Review all actions of the executors, trustees, and others related to the estate.
   c) Help in asserting the true value of and extent of the assets of the estate.
   d) Helping in planning strategy both in relation to the executor, trustees and their attorneys so as to best protect the client's interest.

4. It is understood that "Douglas" role shall be that of "Consultant" not attorning in these proceeding.

5. It is agreed between the parties that "Douglas" shall be paid at the rate of $200.00 per hour, having consulted approximately ten hour to date.
   a) The parities shall sign a time sheet in hours on a monthly basis.
   b) Additionally, over and above the hourly rate: Because "Douglas" shall not be paid until the estate is settled, any moneys, derived over and above the agreed current estimated value of "Bloom" share "Douglas" shall be entitle to 5% of gross value. The Parties shall meet within two weeks from this date to mutually determine the current estimated value of "Bloom's" share.

_19_ day of June, 1995

By _Norman C Bloom_
(Norman C. Bloom)

_Michael A. Douglas_
Michael A. Douglas

## AMMENDMENT to AGREEMENT

AMENDMENT to AGREEMENT of June 19, 1995 between Norman C. Bloom residing at 3 Fifth Street, East Norwalk, Connecticut, hereinafter known as "Bloom" and Michael A. Douglas, attorney licensed to practice in the State of New York with offices at 13 E 16 Street, N.Y., N.Y. Hereinafter known as "Douglas" agree to the following:

1. That as per paragraph "5" subdivision "b" of the agreement between the parties dated June 19, 1995. The parties met within two weeks of signing to determine the estimated value of the estate as of June 19, 1995 and agreed to put off this determination until the present date.

2. It is agreed between "Bloom" and "Douglas" that paragraph "5" subdivision "B" of agreement of June 19, 1995 be amended in the following manner:

At the settlement of the Estate in addition to the fee arrangement covered in paragraph "5" subdivision "A", "Douglas" fee shall also include a percentage of "Bloom"'s share of the Estate of his father in the following manner:

   a) 5% of the share of the amount between Three Million Dollars and Four Million Dollars.
   b) 2% of his share for the amount between Four Million Dollars and Five Million Dollars.
   c) 6% of his share for the amount between Five Million Dollars and Six Million Dollars.
   d) 6% of his share for the amount between Six Million Dollars and Seven Million Dollars.
   e) 6% of his share for the amount between Seven Million Dollars and Eight Million Dollars.
   f) 5% of his share for any amounts over Eight Million Dollars.

3. This amount shall represent the fee to "Douglas" as per the agreement due of June 19, 1995 sub "B" as well as the Hourly fee arrangement covered in paragraph "5" sub(a).

4. The Bloom gross share amount shall be the gross amount determined as "Bloom"'s share consisting of the various Trusts and properties including the value of the grounds and Estate.

5. "Douglas" fee shall be paid by "Bloom" promptly on resolution of the monetary issues of the estate by the parties. Said fee is a personal obligation of Bloom to Douglas and Douglas fee is not contingent of Court approval.

6. Monies are not due and owing to Douglas from Bloom even afer resolution of financial issue until "Bloom" receives his share of the estate through distribution there of. However, if "Bloom" receives installment distribution then Douglas will be entitled to

his proportional share, in regard to subdivision b (5%).

"Douglas" hourly fee should be due and paid immediately on final distribution of the estate, whether it be installment or wholly distributed.

Dated: 29 September 1995
East Norwalk, CT.

*Norman C. Bloom*
Norman C. Bloom

*Michael A. Douglas*
Michael A. Douglas