# EXHIBIT E

1

```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * *
                                *
                                *    CIVIL ACTION NO.
NORMAN C. BLOOM,                *
         Plaintiff              *    302 CV 1619 AWT
                                *
     V.                         *
                                *
                                *
MICHAEL A. DOUGLAS              *
         Defendant              *
                                *    AUGUST 14, 2003
* * * * * * * * * * * * * * *
MICHAEL A. DOUGLAS,             *
   Third-Party Plaintiff        *
                                *
     V.                         *
                                *
                                *
NORMAN C. BLOOM, NORMAN R.      *
BLOOM REVOCABLE TRUST,          *
NORMAN R. BLOOM FAMILY SPRAY    *
TRUST, and NORMAN R. BLOOM      *
IRREVOCABLE INSURANCE TRUST     *
   Third-Party Defendants       *
* * * * * * * * * * * * * * *
```

## Deposition of RICHARD ZEISLER, ESQ.

Deposition taken in the above-entitled action, pursuant to the Stipulations set forth herein, before Marion Strachman, Notary Public, at the Law Offices of ZEISLER & ZEISLER, P.C. 558 Clinton Avenue, Bridgeport, Ct. on the 14th day of August, 2003, 1:05 p.m.

**Marion Strachman**
*Certified Court Reporter*
93 Silvermine Avenue
Norwalk, CT 06850
(203) 846-0549

```
 1
 2
 3
 4    A P P E A R A N C E S:
 5
 6
 7         FOR THE PLAINTIFF:           FREDERICK A. LOVEJOY, ESQ.
                                       276 CENTER ROAD
 8                                     EASTON, CT. 06612
 9
                                       SLAVITT, CONNERY & VARDAMIS
10         FOR THE DEFENDANTS:         GEORGE R. CIAMPA, ESQ.
                                       618 WEST AVENUE
11                                     NORWALK, CT. 06850
12
           ALSO PRESENT:               MICHAEL A. DOUGLAS, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
```

1  descendants in the company and that it would be
2  in everyone's best interest. We were at a
3  meeting or two about that. Then Michael and I
4  sat down at a breakfast meeting at a diner and
5  kind of got to know each other. I wanted to know
6  who he was and what he was doing.
7      Q   Excuse me for cutting you off. Since you
8  said you had a breakfast discussion or a
9  discussion at a diner to get to know Mr. Douglas
10 better, can you explain for us what, in fact,
11 was discussed at that meeting, what he told you
12 about himself, and anything you might have
13 asked him?
14     A   We talked about women, the Yankees and
15 the Knicks and I think there was very little of
16 the Blooms, if any. I can't recall any of the
17 Blooms. But this was, again, in '99.
18     Q   Did you learn anything about, either at
19 that meeting or subsequent, about Mr. Douglas
20 and did you understand he was as lawyer?
21     A   That he was a lawyer. That he is a
22 lawyer. He had a place near Norman Bloom. He had
23 been consulting with Norman about this case and
24 Norman and he had talked on numerous occasions.

```
 1  That he had brought Cohen & Wolf as a law firm in
 2  to work with him to try to straighten out some
 3  issues that Norman had with his company and with
 4  his brothers.
 5       Q    And when you spoke to Mr. Douglas about
 6  the situation with the estate and Tallmadge
 7  Brothers, would it be fair to say you were
 8  discussing legal issues or business issues or
 9  what did you discuss with Mr. Douglas when you
10  were talking about these entities?
11       A    I don't recall ever talking to Mr.
12  Douglas alone. Every meeting we ever had was
13  with Mr. DiMarco and Mr. Douglas. So, we did
14  discuss legal issues. We did discuss, among the
15  group, and I think your client was there
16  probably 90% of the time, if not more,
17  basically, legal issues and whatever issues
18  came up, strategy issues, economic issues.
19            Michael was involved in the economic
20  side. DiMarco was kind of involved in,
21  legally, this is the way you want to go, this is
22  the way we should lay it out in court and what
23  had to happen.
24            There were some issues with respect
```

1  to the estate of Bob's father, Robert Bloom's
2  father. DiMarco, who is an expert in trusts and
3  estates worked on that. I'm not sure Douglas had
4  anything to say other than it had to get
5  resolved. But, again, you're talking about
6  several years ago.
7      Q   And did all these meetings that you
8  refer to, the 30 or 40 meetings, did they take
9  place in the State of Connecticut or some other
10 state?
11     A   I don't recall that they took place
12 outside the State of Connecticut, except that
13 once during the proceedings, Mr. Douglas
14 visited me at an apartment I own in Florida and
15 we went out and had dinner. But, at that time,
16 we didn't discuss anything about this case to
17 speak of.
18     Q   You say once during the proceedings.
19 What proceedings?
20     A   Once during the case. Once during the
21 history of this case, he met me in Florida to
22 have dinner. I guess I told him I was going to be
23 in Florida. He said he would be in Florida and I
24 said let's get together.

1  Q  Would it be fair to say that all the
2  substantive conferences you had with Mr.
3  Douglas took place in the State of Connecticut?
4  A  Absolutely.
5  Q  Could you give us a feeling of how long
6  each one of those conferences lasted? Was it
7  something that lasted an hour or usually
8  substantially longer than an hour?
9  A  I think they were always more than an
10 hour. Two hours, there hours. There were
11 corporate board meetings that we went to.
12 Extensive corporate board meetings that all of
13 the lawyers attended, Douglas, DiMarco, me and
14 Mario Zangari and others. Those would last
15 several hours. I never remember a one hour
16 meeting.
17 Q  Did you attend any court proceedings
18 during the time you represented Mr. Robert
19 Bloom?
20 A  One.
21 Q  And where was that, sir?
22 A  That was a court proceeding that was
23 brought by Attorney Reynolds Gordon, who had
24 been retained by Norman Bloom, I think, and it

```
 1  was to oppose certain corporate actions that
 2  Hillard brought unilaterally with respect to
 3  corporate changes he was trying to make in
 4  Tallmadge Brothers.
 5      Q   You say it is a court proceeding. Do you
 6  remember what court it took place in?
 7      A   Superior Court at Bridgeport.
 8      Q   Is that on Main Street, sir?
 9      A   Yeah. Judge Stevens.
10      Q   Did that court proceeding last a couple
11  of hours, a day or more than a day?
12      A   It was a few hours a day for several
13  days. I can't say how many, but I would say it
14  probably lasted five or six. But, your client
15  was there at all times.
16      Q   Was Mr. Douglas at the proceedings in
17  court before Judge Stevens?
18      A   He was in the audience. He was not at the
19  counsel table.
20      Q   He did, to the best of your knowledge,
21  attend the proceedings?
22      A   I think he was there for all of the
23  proceedings. I'm not sure whether he might have
24  missed a half a day or got there late. Usually
```

1  when I was there, he was there. I was not at all
2  of them myself.
3      Q    Have you ever had any discussions with
4  Mr. Douglas about what type of law he practices?
5      A    I don't think so.
6      Q    Did you ever from some other source
7  learn the type of law Mr. Douglas practices?
8      A    No.
9      Q    As we sit here today, do you know what
10 type of law Mr. Douglas practices?
11     A    I don't know if he does. I just know that
12 he is a lawyer. As far as I was concerned, he was
13 only involved in business dealings. Strategic
14 economic issues.
15     Q    But, you don't know what was discussed
16 between Mr. Douglas and his client, Mr. Bloom,
17 when you're not present?
18     A    Absolutely not.
19     Q    You had a document before you that you
20 referred to as part of the Divisive
21 Reorganization Agreement?
22     A    Yes.
23     Q    Can you explain what the Divisive
24 Reorganization Agreement served?

1      A    The litigation and other proceedings
2  kind of resulted in an understanding that
3  Attorney Zangari, who was brought in by Richard
4  Worth, a workout consultant that I recommended
5  that we bring into the case, suggested that the
6  company be divided into two parts. In order to
7  do that on a tax-free basis, it had to be done
8  as a tax-free Divisive Reorganization and be
9  qualified by the Internal Revenue Service and
10 Zangari's office has been working on that
11 division of the assets.
12     Q    Would it be fair to say that, that
13 document is a legal document, the Divisive
14 Reorganization Agreement?
15     A    A complicated legal document.
16     Q    Fair enough. Did you take part in either
17 drafting it or negotiating what would go into
18 that document?
19     A    I don't think we drafted it. We may have
20 made a few comments as it went along. For the
21 most part, our comments were incorporated in
22 the business not in the legal part of it because
23 that was Attorney Zangari's bailiwick, to get
24 it on a tax-free basis. DiMarco and I,

16

1  basically, gave input on the business issues
2  that were important to the Bloom brothers. I
3  imagine that Douglas may have given his input in
4  that, too. I think he did. The business issues
5  that would go into that agreement, it was up to
6  Zangari to prepare it properly and get it
7  approved by the IRS.
8      Q    Do you know whether it has been approved
9  by the IRS?
10     A    It is in the process.
11     Q    As we sit here today?
12     A    In the process of.
13     Q    Did any of the 30 or 40 conferences that
14 you referred to involve the Divisive
15 Reorganization Agreement or involve some other
16 subject matter?
17     A    For the most part, they did not involve
18 the Divisive Reorganization because the
19 Divisive Reorganization was the solution to the
20 issues that were going along. Most of the
21 discussions dealt with how we could make
22 certain that Tallmadge Brothers was run
23 economically and profitably and make certain
24 that money wasn't stolen from the company. So,

1  what we were really focused on in most of our
2  conversations was the efficient operation of
3  the company. It was feared it wasn't being run
4  efficiently and that people were profiting from
5  it that shouldn't have.
6     Q   Did Mr. Douglas take part in those
7  discussions that you just testified to?
8     A   Yes.
9     Q   During the course of time that you
10 represented Robert Bloom, did you have occasion
11 to talk to Mr. Douglas over the telephone?
12    A   Oh, yeah.
13    Q   Approximately, how many times did you
14 talk to Mr. Douglas on the telephone?
15    A   Hard to guess, but probably 30 or 40.
16    Q   And I assume when you were talking to
17 Mr. Douglas on the telephone, you were sitting
18 here in your office in Connecticut?
19    A   Not always. Sometimes I was in Florida.
20 Sometimes I was at my home. Sometimes I was in
21 my car.
22    Q   Would it be fair to say that the lion
23 share of the times that you spoke to Mr. Douglas
24 on the telephone, you were personally situated

```
 1  Attorney DiMarco was also present? Would you
 2  like me to rephrase it?
 3      A   I understand. I'm just trying to go back
 4  in my memory. I think that, that is true. In
 5  every-- I can't think of any other instance--
 6  Only one that I can remember where our clients
 7  were signing the Divisive Reorganization, we
 8  met in New Haven. I can't remember whether
 9  DiMarco was there or not. I don't know, but I do
10  know specifically that at every meeting DiMarco
11  was there and I always wondered why he had to be
12  there. I never thought he was contributing a
13  lot. Apparently, he was the one that would get
14  the legal part. We hardly ever got to the legal
15  part. We were dealing more with the emotional
16  part.
17      Q   You never saw Michael Douglas appear in
18  a Connecticut Court on behalf of Norman Bloom,
19  did you?
20      A   I never saw him appear in court, prepare
21  a pleading, give a paper to his client to sign
22  or comment on Connecticut law in anyway. In
23  fact, he would always defer to me or Mr. DiMarco
24  if we ever got to a legal issue and ask us what
```

1                REDIRECT BY LOVEJOY
2  we thought.
3      Q    Did you say you never saw him sign a
4  pleading in Connecticut?
5      A    No, I never saw him sign a pleading.
6           MR. CIAMPA: I have no further
7           questions.
8
9
10 REDIRECT EXAMINATION BY MR. LOVEJOY:
11     Q    You, Mr. Zeisler, don't know whether Mr.
12 Douglas gave Mr. Norman Bloom any advice on
13 Connecticut law or any other state's law when
14 you were not in their presence, do you?
15     A    How could I?
16     Q    Obvious--
17     A    In my presence, no. But, outside of my
18 presence, who knows.
19     Q    And were you ever present when Mr.
20 Douglas told either Mr. Norman Bloom or Mr.
21 Robert Bloom that they should sue Hillard Bloom
22 for what he had done?
23     A    I'm sure that I was in the room when
24 DiMarco and Douglas urged Robert Bloom to get

```
 1                          CERTIFICATION
 2
     STATE OF CONNECTICUT)
 3                                              ss:   NORWALK
     COUNTY OF FAIRFIELD )
 4
 5
          I, hereby certify that I am a Notary Public, in and
 6   for the State of Connecticut, duly commissioned and
     qualified to administer oaths.
 7        I, further certify that the deponent named in the
     foregoing deposition was by me duly sworn and thereupon
 8   testified as appears in the foregoing deposition; that
     said deposition was taken by me stenographically in the
 9   presence of counsel and reduced to print by myself or
     under my direction, and the foregoing is a true and
10   accurate transcript of the testimony.
          I further certify that I am neither counsel nor
11   related to either of the parties to said suit, nor am I
     interested in the outcome of said cause.
12        In witness whereof I have hereunto set my hand and
     affixed my notarial seal this 28th day of August,
13   2003.
14
            (My Commission Expires January, 2004.)
15
                    _____
16                              Marion Strachman
17         License# 000296   Notary Public
18
19
20
21
22
23
24
```