# EXHIBIT F

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * *
                           *
                           *     CIVIL ACTION NO.
NORMAN C. BLOOM,           *
       Plaintiff           *     302 CV 1619 AWT
                           *
    V.                     *
                           *
                           *
MICHAEL A. DOUGLAS         *
       Defendant           *
                           *     AUGUST 6, 2003
* * * * * * * * * * * * * *
MICHAEL A. DOUGLAS,        *
   Third-Party Plaintiff   *
                           *
    V.                     *
                           *
                           *
NORMAN C. BLOOM, NORMAN R. *
BLOOM REVOCABLE TRUST,     *
NORMAN R. BLOOM FAMILY SPRAY*
TRUST, and NORMAN R. BLOOM *
IRREVOCABLE INSURANCE TRUST*
   Third-Party Defendants  *
* * * * * * * * * * * * * *
```

## Deposition of RICHARD DiMARCO, ESQ.

Deposition taken in the above-entitled action, pursuant to the Stipulations set forth herein, before Marion Strachman, Notary Public, at the Law Offices of COHEN & WOLF, P.C. 1115 Broad Street, Bridgeport, Ct. on the 8th day of August, 2003, 10:10 a.m.

```
 1
 2
 3
 4  APPEARANCES:
 5
 6
 7      FOR THE PLAINTIFF:        FREDERICK A. LOVEJOY, ESQ.
                                  276 CENTER ROAD
 8                                EASTON, CT. 06612
 9
                                  SLAVITT, CONNERY & VARDAMIS
10      FOR THE DEFENDANTS:       GEORGE R. CIAMPA, ESQ.
                                  618 WEST AVENUE
11                                NORWALK, CT. 06850
12
        ALSO PRESENT:             MICHAEL A. DOUGLAS, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1  time?
 2      A    Yes.
 3      Q    When did you become privy to the fact
 4  that there was an agreement?
 5      A    The only thing I knew was there was an
 6  agreement. I never saw any agreement. I don't
 7  know. Sometime in '97.
 8      Q    And what did you understand, if
 9  anything, that Mr. Douglas was supposed to do
10  for Mr. Bloom under this agreement?
11      A    Well, I never saw the agreement.
12      Q    I understand that. Did Mr. Bloom or Mr.
13  Douglas ever tell you what Mr. Douglas was
14  supposed to do under this agreement?
15      A    I think he was supposed to act as a
16  business advisor, consultant, I think.
17      Q    And when you say, "business advisor,
18  consultant, I think," where did you get that
19  information? Was that something Mr. Douglas
20  told you or Mr. Bloom told you?
21      A    I think they both might have mentioned
22  it because they were both aware that he was not
23  admitted to practice law in Connecticut.
24  Norman knew that from day one. And, so, I think
```

```
 1      A     And there were a number of times when I
 2   think I heard Mike state that he was a business
 3   advisor. A consultant. I think, he called
 4   himself business consultant or something like
 5   that.
 6      Q     I understand that Mr. Douglas isn't
 7   admitted to the Bar in Connecticut and couldn't
 8   prepare any legal proceedings and that's the
 9   purpose of Cohen & Wolf.
10      A     And Norman knew that from day one.
11      Q     Fine. That's your testimony. But,
12   you're not privy to what the negotiations
13   between Norman Bloom and Michael Douglas as to
14   what he was supposed to do before Cohen & Wolf
15   came on the scene, are you?
16      A     No.
17      Q     And you haven't seen how Mr. Douglas
18   described himself in any written agreements
19   entered into between him and Mr. Bloom, have
20   you?
21      A     I have not seen them, no.
22      Q     And if I tell you that the contract or
23   the agreement says "legal consultant" or
24   "legal advisor," would you agree with me that,
```

1  that's what Mr. Douglas was providing to Mr.
2  Bloom?
3      A   Mr. Douglas, as far as I was concerned,
4  was an advisor to Norman part of his time just
5  like Mike Errico.
6      Q   You don't know whether he was giving
7  Mr. Bloom legal advice or business advice? I
8  mean what you gave him with respect to business
9  organization stuff, you charged a legal fee
10 for, right?
11     A   That was my role. I was providing legal
12 advice, yeah, and representation.
13     Q   And if Mr. Douglas was providing the
14 same type of advice, is that legal advice that
15 he is giving Mr. Bloom or because it is done by
16 Mr. Douglas it is something else?
17     A   That probably calls for a conclusion
18 that I'm not qualified to make.
19     Q   Okay. The business advice, as you call
20 it, that you gave to Mr. Bloom about trust and
21 estates or reorganization, when you do that for
22 a client in the State of Connecticut, you
23 consider that to be legal advice, do you not?
24     A   Yes, I was his lawyer. I don't dispute

1  that I gave him legal advice.
2     Q   And the question is if Mr. Douglas gave
3  the same sort of advice whether or not it was
4  legal advice or not. Would you agree with me?
5     A   If, in fact, he gave that type of advice
6  to Norman, I don't know. There's probably some
7  sort of line between business and legal advice.
8  I don't know what falls on what side of the
9  line. All I know is that I drafted every
10 document that was ever filed with any court and
11 agreement.
12    Q   You or Mr. Albrecht signed it because
13 you're commissioners of the Superior Court in
14 the State of Connecticut?
15    A   We were Norman's lawyers. That was our
16 job.
17    Q   I understand. I think your testimony is
18 many of these, if not all of these pleadings,
19 were sent to Mr. Douglas along with Mr. Bloom
20 and the rest of his team and you?
21    A   That's correct.
22    Q   And if Mr. Douglas wanted a change or
23 suggested a change to the document, you'd
24 consider making that change, right?

1   A   Yeah.
2   Q   Did you speak with him almost everyday?
3   A   I would say that during certain periods
4 when I was actively involved in the case, yes.
5   Q   Did those conversations occur by
6 telephone?
7   A   Yeah.
8   Q   And when those conversation were going
9 on, was Mr. Douglas in his office in New York
10 City?
11   A   If his office numbers are 212-633-1123
12 or 212-691--  I forgot. It was impaled in my
13 memory. He had two different numbers in New
14 York that I called him at very frequently.
15   Q   Would it be fair to say, sir, that your
16 conversations with Mr. Douglas occurred during
17 a time when you were in your office in
18 Connecticut and he was in his office in New
19 York?
20   A   Yeah.
21   Q   Is that a fair statement?
22   A   Sure. Yes. "Sure" means yes.
23   Q   I'm going to ask you about the topics
24 that you and he discussed during those

1  telephone conversations. Is it fair to say that
2  you and he discussed strategies for uncovering
3  assets for the estate?
4      A   Sure. Yes.
5      Q   Did Mr. Douglas, to your knowledge,
6  suggest to you strategies on uncovering
7  assets?
8      A   Probably he did.
9      Q   Did you receive from Mr. Douglas
10 suggestions on certain pleadings which this
11 law firm should file on behalf of Norman Bloom?
12     A   Well, he reviewed all the pleadings
13 that I sent to Norman and to Mike and sometimes
14 to Mike Errico. He reviewed them and made
15 suggestions at that point.
16     Q   When you sent Michael Douglas copies of
17 draft meetings, didn't you send them to his
18 office in New York City?
19     A   Sure. Sent or faxed, yes.
20     Q   Did you ever hear back from Mr. Douglas
21 as to his comments on those pleadings?
22     A   Yeah, sure. Usually.
23     Q   Yes?
24     A   Yes.

1   Q    And is it not the case when you heard
2  back from Mr. Douglas, it was either by fax or
3  telephone?
4   A    Yes.
5   Q    And is it not the case that those faxes
6  and those telephone calls originated from Mr.
7  Douglas from his office in New York City. Is
8  that not the case?
9   A    I would say so, yeah.
10  Q    Did Mr. Douglas make any suggestions to
11 you on letters that he felt this law firm ought
12 to prepare on behalf of Norman Bloom?
13  A    Yes.
14  Q    Did he make those suggestions in his
15 law firm from his office in New York City?
16  A    The one that Mr. Lovejoy just showed me
17 came from his office in New York City.
18  Q    Do you remember other suggestions
19 originating from Mr. Douglas on letters which
20 this law firm out to prepare?
21  A    Perhaps. Probably. I mean, you're
22 talking about a 5 year period. So, I would say
23 that is very likely.
24  Q    And if this very likely event were, in

```
 1    Q    You testified that you had treated Mr.
 2  Douglas as Mr. Bloom's business
 3  representative. Is that a fair statement?
 4    A    Yes.
 5    Q    To your knowledge, did any of the
 6  pleadings prepared by this law firm bear
 7  Michael Douglas's name?
 8    A    No.
 9    Q    To your knowledge, did Michael Douglas
10  sign any of the pleadings prepared on behalf of
11  Norman Bloom by this law firm?
12    A    No.
13    Q    To your knowledge, did Michael Douglas
14  make a court appearance in conjunction with any
15  of the lawyers in this law firm on behalf of
16  Norman Bloom?
17    A    No.
18    Q    To your knowledge, did Michael Douglas
19  depose any witnesses on behalf of Norman Bloom
20  in this proceeding?
21    A    No.
22    Q    To your knowledge, did Michael Douglas
23  argue any motions in court on behalf of Norman
24  Bloom in this proceeding?
```

1  much.
2     Q   So your testimony is that this law firm
3  billed Norman Bloom for several thousand hours
4  of attorney's fees in assisting him with his
5  dispute with his father's estate. Is that your
6  testimony?
7     A   We represented him for over 5 years and
8  my best guess is that it probably involved
9  thousands of hours of time, yes.
10    Q   How many lawyers here worked on this
11 file?
12    A   I don't know. Various ones at different
13 times. It was a 5 year period.
14    Q   How many lawyers here worked on his
15 file during that 5 year period?
16    A   Half a dozen.
17    Q   How did you first know Fred Lovejoy?
18        MR. LOVEJOY: Which one?
19    Q   The man sitting across the table from
20 you.
21    A   Fred represented Norman in various
22 matters. He represented Norman in an action
23 that we brought--
24        MR. LOVEJOY: You can talk to

```
 1            your partner. If you are going
 2            to divulge attorney/client
 3            information, I suggest that
 4            you speak to Attorney Albrecht.
 5      A     (Continuing) I'm not sure. I certainly
 6  don't want to breach the terms of any
 7  agreement.
 8                 MR. LOVEJOY: I'm not saying it
 9            is part of the agreement. You may
10            want to consult with a partner
11            if you will talk about information
12            you obtained from Mr. Bloom when
13            you were representing him. I would
14            suggest that you talk to one of
15            your partners about what you will
16            say.
17      Q     Do you wish to suspend and go talk to
18  your partner about this?
19      A     Let's hear the question so I have
20  something to consider.
21                 MR. CIAMPA: Can the reporter
22            read back the pending question.
23                 (The pending question was
24            read by the reporter.)
```

```
 1      Q    In the fall of 2001, did you know Fred
 2 Lovejoy?
 3      A    Yes.
 4      Q    In the fall of 2001, did you have
 5 occasion to talk to Fred Lovejoy occasionally
 6 about this case?
 7      A    In the fall of 2001?
 8           MR. LOVEJOY: Are we talking about
 9           the litigation that we're here
10           about today?
11           MR. CIAMPA: Yes.
12      A    I'm not sure.
13      Q    Sitting here today, do you have a
14 recollection in the fall of 2001 that Fred
15 Lovejoy told you that Norman Bloom would try to
16 avoid paying Michael Douglas his fee for
17 assisting him?
18      A    I'm sure I had conversations where Fred
19 mentioned that Mike had "problems."
20      Q    What problems did Fred Lovejoy tell you
21 that Michael Douglas had?
22      A    I think the "problem" that we're all
23 here talking about today.
24      Q    And what was that, sir?
```

A I think he was going to assert that Mike couldn't collect his fee because he was illegally practicing law in Connecticut.

Q And when did Mr. Lovejoy tell you that, that was what Mr. Bloom was going to assert in response to Douglas's request for his fee? Wasn't that in the fall of 2001?

MR. LOVEJOY: Objection.

A I don't remember when it was. Could have been earlier.

Q So, your testimony is either it was in the fall of 2001 or earlier than the fall of 2001, correct?

MR. LOVEJOY: Objection.

THE DEPONENT: What's your ground?

MR. LOVEJOY: You have no role in resolving the objection.

THE DEPONENT: You're objecting that I'm breaching any client confidence or objecting that I'm breaching the settlement agreement?

MR. CIAMPA: Just making an objection.

```
 1      A     Then I can answer? Can I have the
 2   question?
 3               (The pending question was
 4               read back by the reporter.)
 5      Q     That you had the conversation with
 6   Fred?
 7      A     Uh-hum.
 8      Q     Is that a yes?
 9      A     Yes.
10      Q     Does your confidentiality agreement
11   with Norman Bloom prevent you from telling me
12   how much your law firm charged him his fees?
13               (A pause)
14      Q     Do you want to talk to Rick Albrecht? Do
15   you want me to suspend the deposition and you
16   can find Rick Albrecht so you can ask him about
17   this?
18      A     I would say that we have a settlement
19   agreement, which we have agreed to keep
20   confidential and, obviously, that agreement
21   related to a case that we brought to secure our
22   legal fees. So, I guess, I really can't tell
23   you what the legal fees were that were charged.
24      Q     Did you say you cannot tell me?
```

1    A    Yes. He couldn't handle Norman's case
2  here in Connecticut, so they hired us. Norman
3  hired us with Mike's assistance. Mike remained
4  his advisor during that long period of time
5  with the understanding that he couldn't act as
6  a lawyer in Connecticut and Norman knew that
7  from day one.
8    Q    There was a fee dispute between Cohen &
9  Wolf and Norman Bloom. It is a dispute that was
10 resolved by an agreement which binds this firm
11 to a certain level of confidentiality. Am I
12 right so far?
13   A    Yes, regarding the terms of the
14 agreement.
15   Q    Did Michael Douglas have any
16 involvement in negotiating that resolution of
17 that fee dispute?
18   A    Not to my recollection.
19   Q    At one time is it not the case that this
20 law firm was considering action against Norman
21 to collect its fees from Norman?
22   A    Considering an action? Yeah, I mean, we
23 brought an action in the Superior Court. We had
24 hearings.

```
 1
 2                         CERTIFICATION
 3
    STATE OF CONNECTICUT)
 4                                          ss:   NORWALK
    COUNTY OF FAIRFIELD )
 5
 6
        I, hereby certify that I am a Notary Public, in
 7  and for the State of Connecticut, duly commissioned
    and qualified to administer oaths.
 8      I, further certify that the deponent named in the
    foregoing deposition was by me duly sworn and
 9  thereupon testified as appears in the foregoing
    deposition; that said deposition was taken by me
10  stenographically in the presence of counsel and
    reduced to print by myself or under my direction, and
11  the foregoing is a true and accurate transcript of the
    testimony.
12      I further certify that I am neither counsel nor
    related to either of the parties to said suit, nor am
13  I interested in the outcome of said cause.
        In witness whereof I have hereunto set my hand and
14  affixed my notarial seal this 22nd day of August,
    2003.
15
16      (My Commission Expires January, 2004.)
17
                              _____
18                                  Marion Strachman
           License# 000296     Notary Public
19
20
21
22
23
24
```

Marion Strachman
*Certified Court Reporter*
93 Silvermine Avenue                              (203) 846-0549
Norwalk, CT 06850