UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Jun 1   2 52 PH '04

U.S. DISTRICT COURT
NEW HAVEN. CONN.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NORMAN C. BLOOM,
 *Plaintiff,*

  v.

         3:02CV907(PCD)

MICHAEL A. DOUGLAS,
 *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL A. DOUGLAS,
 *Third-Party Plaintiff,*

  v.

         May 27, 2004

NORMAN R. BLOOM REVOCABLE TRUST,
NORMAN R. BLOOM FAMILY SPRAY
TRUST, and NORMAN R. BLOOM
IRREVOCABLE INSURANCE TRUST
 *Third-Party Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

REPLY BRIEF OF PLAINTIFF NORMAN C. BLOOM AND
THIRD-PARTY DEFENDANTS NORMAN R. BLOOM REVOCABLE TRUST,
NORMAN R. BLOOM FAMILY SPRAY TRUST, AND NORMAN R. BLOOM
IRREVOCABLE INSURANCE TRUST IN RESPONSE TO DEFENDANT/
THIRD-PARTY PLAINTIFF MICHAEL A. DOUGLAS'S
MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT
DATED APRIL 15, 2004, IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT DATED DECEMBER 5, 2003
(DOCKET NOS. 47, 48, 49, 50, 51, 52, AND 53)

  Now come plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom

Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable

Insurance Trust, and submit this Reply Brief in response to the defendant/third-party plaintiff

Michael A. Douglas's April 15, 2004 Memorandum in Opposition to Summary Judgment and in

support of plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable

ORAL ARGUMENT REQUESTED
<u>TESTIMONY NOT REQUIRED</u>

Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust's Motion for Summary Judgment dated December 5, 2003.

A review of defendant/third-party plaintiff Michael A. Douglas's April 15, 2004 Affidavit and Memorandum in Opposition shows that in his attempt to distance himself from having provided any legal advice whatsoever to plaintiff Norman C. Bloom, Michael A. Douglas appears to admit that he has never represented any clients in a legal capacity since he was admitted to the bar of the State of New York, and that he has absolutely no legal expertise in the areas that he enumerated in the "Agreement" (signed on June 19, 1995) that he drafted, which encompassed the duties that he would perform on behalf of plaintiff Norman C. Bloom. (See Exhibit A to plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust's Exhibit Appendix dated December 5, 2003 (Docket No. 53)).

As such, defendant/third-party plaintiff Michael A. Douglas has admitted that he committed fraud when he drafted and had plaintiff Norman C. Bloom sign the June 19, 1995 "Agreement" because Michael A. Douglas's Affidavit, dated April 15, 2004, contradicts the type(s) of services that Michael A. Douglas was to perform on behalf of Norman C. Bloom; i.e., those of a "legal nature."

Unfortunately, in an attempt to create an issue of genuine material fact that might prevent this Court from granting plaintiff Norman C. Bloom and third-party defendants Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R. Bloom Irrevocable Insurance Trust's Motion for Summary Judgment, Michael A. Douglas has been untruthful. Simply put, the gyrations contained in Michael A. Douglas's Affidavit dated April 15, 2003 do not comport with the numerous documents drafted/authored by Michael A. Douglas,

2

over the six plus year period that he represented plaintiff Norman C. Bloom, and which clearly demonstrate that what Michael A. Douglas was providing to plaintiff Norman C. Bloom was legal advice, legal advice from an attorney that was not authorized to practice law in the State of Connecticut. By his own admission, he had no legal expertise on which to base the legal advice he contracted to provide to Norman C. Bloom, and he did not disclose this fact to plaintiff Norman C. Bloom as required by the Code of Professional Responsibility. If Michael A. Douglas did not intend to provide legal services, why then would each and every bill rendered by Michael A. Douglas be proffered on letterhead stating that he is an "Attorney At Law" and why would his fee bills be headed with "Statement of Legal Services Rendered" or "Legal Expenses".

Unfortunately, what Michael A. Douglas was focusing on throughout was the "pot-of-gold" he expected to cash in on, as opposed to whether or not he could or should provide legal advice to plaintiff Norman C. Bloom in the State of Connecticut.

While counsel for defendant/third-party plaintiff Michael A. Douglas has cited to numerous non-Connecticut cases in an attempt to create a genuine issue of material fact, those cases are of no assistance to this Court as it is compelled to apply the law of the State of Connecticut to this dispute.

Michael A. Douglas's counsel's argument that what advice Michael A. Douglas gave to plaintiff Norman C. Bloom during the period of 1995 to 2002 was only business advice, and did not constitute the practice of law, rings hollow. If this argument is so, then the legal advice that was provided by Richard DiMarco, Esq. of Cohen & Wolf, P.C. and Richard Ziesler, Esq. of Ziesler & Ziesler would also not constitute legal advice because the majority of their advice was of the same nature as that provided by Michael A. Douglas. Both of these lawyers sent statements for legal services to their respective clients, and both admitted their services were legal services.

3

The fact that some of the legal advice proffered by Michael A. Douglas, to Norman C. Bloom, is what is referred to as transactional legal advice does not now make it into non-legal advice because Michael A. Douglas, an attorney not admitted in Connecticut, did it.

The old adage that if it walks like a duck, quacks like a duck, and smells like a duck, then it is a duck, should hold true here. Michael A. Douglas engaged in the unauthorized practice of law in Connecticut.

Had Michael A. Douglas wanted to establish that he was not acting as an attorney for Norman C. Bloom, then he could have contemporaneously invoked language that indicated just that, rather than sending statements for legal services and holding himself out as an "Attorney-At-Law" by using his legal letterhead when corresponding to everyone involved in the various Bloom family matters.

Richard DiMarco's testimony is clear that Michael A. Douglas was his co-counsel representing Norman C. Bloom, and that they as co-counsel discussed legal issues/strategy throughout. Richard DiMarco testified, at p. 76, ll. 11-23 as follows:

> Q.    A simple question. Mr. DiMarco, during the course of your testimony, you stated that you thought that Mr. Douglas was acting as an advisor or business advisor to Mr. Bloom, correct?
>
> A.    Yes, because there were conversations that took place during the 5 year period -- The reason that we were hired is because Norman needed co-counsel. Mike told him from day one that he was not licensed to practice law in Connecticut. That he had to hire co-counsel. They were dissatisfied and they hired Cohen & Wolf.

(emphasis added) (See Exhibit A attached hereto)

Moreover, Richard DiMarco, Esq. testified that he discussed legal strategy, et cetera, with Michael A. Douglas for a period of approximately 6 years. Additionally, Attorney DiMarco

4

testified that <u>he normally had to go through Michael A. Douglas</u> (his co-counsel) to plaintiff

Norman C. Bloom to get instructions. He testified at p. 30, ll. 15-20:

> Q.    What was the purpose of discussing it with Mr. Douglas?
>
> A.    Mike was his very close advisor. <u>Mike was the one who had Norman's ear on everything. Norman never made a move without first discussing it with Mike.</u>

(emphasis added) (See Exhibit A attached hereto – highlighting ours)

In fact, Attorney DiMarco admitted that the transactional advice that he gave Norman C.

Bloom was, in fact, legal advice for which he charged a legal fee. He stated at p. 78, ll. 19-24:

> Q.    Okay. The business advice, as you call it, that you gave to Mr. Bloom about trust and estates or reorganization, when you do that for a client in the State of Connecticut, you consider that to be legal advice, do you not?
>
> A.    Yes. I was his lawyer. I do not dispute that I gave him legal advice.

(See Exhibit A attached hereto)

THE APPLICABLE LAW SUGGESTS THAT THIS COURT
SHOULD DISREGARD THE APRIL 15, 2004 AFFIDAVIT OF
MICHAEL A. DOUGLAS IN RULING ON PLAINTIFF NORMAN C. BLOOM
AND THIRD-PARTY DEFENDANTS NORMAN R. BLOOM REVOCABLE TRUST,
NORMAN R. BLOOM FAMILY SPRAY TRUST, AND NORMAN R. BLOOM
<u>IRREVOCABLE INSURANCE TRUST'S MOTION FOR SUMMARY JUDGMENT</u>

Michael A. Douglas's April 15, 2004 affidavit should be treated like any affidavit that is

proffered in opposition to a Motion for Summary Judgment that contradicts prior testimony; i.e.,

disregarded by the Court.

In <u>Martin v. Merrell Dow Pharmaceuticals, Inc.</u>, 851 F.2d 703 (3rd Cir. 1988), the Court

stated with respect to affidavits that were submitted in order to oppose a Motion for Summary

Judgment and contradicted prior evidence without explanation:

> The numerous other courts of appeals that have considered the situation in which a party contradicts, without satisfactory explanation, his or her prior testimony, have reached the same decision. <u>Each court has concluded that the objectives of</u>

5

summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit. *Franks v. Nimmo*, 796 F.2d 1230 (10th Cir. 1986); *Miller v. A.H. Robins Co.*, 766 F.2d 1102 (7th Cir. 1985); *Van T. Junkins and Associates v. United States Industries*, 736 F.2d 656 (11th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540 (9th Cir. 1975); *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969). Indeed, the reasoning advanced by the Second Circuit in *Perma Research* applies with equal force to the present case:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at that time and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact. (emphasis added)

Moreover, in <u>Hackman v. International Brotherhood of Teamsters</u>, 932 F.2 239 (3rd Cir. 1991), the Court of Appeals stated the following with respect to an affidavit proffered in an attempt to defeat a Motion for Summary Judgment:

> On appeal plaintiff contends that his affidavit alleging confusion at the deposition raised a question of fact preventing the entry of summary judgment. Of course, summary judgment is inappropriate when a conflict on a material fact is present in the record.

> In this case, whether plaintiff was advised before June 4, 1989, that the union would not pursue his grievance is crucial because there is no dispute that the six-month statute of limitations set out in *DelCostello* is applicable. *See Vadino v. Valey Engineers*, 903 F.2d 253, 260 (3d Cir. 1990) ("The six-month period commences when the claimant discovers or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation . . . [It] commences when the plaintiff receives notice that the union will proceed no further with the grievance.") <u>The district court rejected the plaintiff's attempt to contradict the admissions he made in his deposition and, instead, accepted his testimony that he had been advised by LiLascio after the hearing on May 31, 1989, and on June 1, 1989, that the local union would not arbitrate his grievance.</u>

6

When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists. "The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit." *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988). In that opinion, we cited the decisions of six other Courts of Appeals supporting that conclusion.

Having carefully reviewed the plaintiff's deposition testimony as well as his affidavit, we are persuaded that the district court properly determined that there was no genuine issue of material fact. By his own admission, plaintiff was notified more than six months before the suit was filed that the union would not proceed further with his claim. Consequently the statute of limitations barred relief.

We therefore find no error in the entry of summary judgment.
(emphasis added)

Because the contract that was drafted by Michael A. Douglas and entered into between the parties states that Michael A. Douglas would be acting as a "legal consultant," and Michael A. Douglas's invoices state that he was billing for "Legal Services", is now contradicted by his April 15, 2004 affidavit, without any explanation, it should be disregarded by this Court.

### MICHAEL A. DOUGLAS IS ESTOPPED FROM NOW ARGUING THAT HE DID NOT PROVIDE LEGAL SERVICES TO PLAINTIFF NORMAN C. BLOOM

The doctrines of promissionary estoppel and equitable estoppel preclude defendant/third-party plaintiff Michael A. Douglas from now asserting that the services he allegedly provided to plaintiff Norman C. Bloom did not constitute legal services; i.e., the practice of law.

In Lombardo's Ravioli Kitchen v. Ryan, 264 Conn. 222, 236-237, 842 A 2nd 1089 (2004), the Supreme Court of Connecticut reiterated the standards required for estoppel. It stated:

"There are two essential elements to an estoppel: the party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does not exist." (Citations omitted; emphasis in original; internal quotation marks omitted.) *W. v. W.*, 256 Conn. 657, 660-62, 779 A.2d 716 (2001).

7

See also: Celentano v. Oaks Condo Association, 265 Conn. 579, 830 A.2d 164 (2003); Union Carbide Corp. v. City of Danbury, 257 Conn. 865, 778 A.2d 204 (2001); W. v. W., 248 Conn. 487, 728 A.2d 1076 (1999)

Here the two elements necessary to establish estoppel are present: First, the Agreement (see Exhibit A to plaintiff Norman C. Bloom's Exhibit Appendix dated December 5, 2003) that Michael A. Douglas drafted and had plaintiff Norman C. Bloom sign indicates that Michael A. Douglas is to provide legal services to Norman C. Bloom, and the numerous invoices that Michael A. Douglas tendered to plaintiff Norman C. Bloom confirm that the services provided were for "Legal Services Rendered". (See Exhibit C to plaintiff Norman C. Bloom's Exhibit Appendix dated December 5, 2003) As such, the aforementioned establish that Michael A. Douglas was, in fact, providing legal services to plaintiff Norman C. Bloom, and Second, as a result of those representations, plaintiff Norman C. Bloom entered into the June 19, 1995 Agreement, and tendered monies to defendant/third-party plaintiff Michael A. Douglas based on the representations contained in the agreement and based on Michael A. Douglas's Statement for Legal Services, only to later learn, and have Michael A. Douglas admit in his April 15, 2004 Affidavit, that he did not provide any legal services to plaintiff Norman C. Bloom.

In Michael A. Douglas's April 15, 2004 affidavit, he claims not to have provided any legal advice to Norman C. Bloom. Defendant/third-party plaintiff Michael A. Douglas should thus be estopped from denying that he provided legal services to plaintiff Norman C. Bloom, because to allow him to do so would result in Michael A. Douglas being able to engage in the unauthorized practice of law in Connecticut, and to allow him to profit from that illegal activity.

<u>CONCLUSION</u>

Based on the foregoing and on plaintiff Norman C. Bloom and third-party defendants

Norman R. Bloom Revocable Trust, Norman R. Bloom Family Spray Trust, and Norman R.

Bloom Irrevocable Insurance Trust's pleadings, <u>et cetera</u>, dated December 5 2003, their Motion

for Summary Judgment should be granted.

Dated: Easton, Connecticut          LOVEJOY & ASSOCIATES
      May 27, 2004                      Attorneys for Plaintiff Norman C. Bloom and Third-
                                  Party Defendants Norman R. Bloom Revocable
                                  Trust, Norman R. Bloom Family Spray Trust, and
                                  Norman R. Bloom Irrevocable Insurance Trust

By: _____
            Frederick A. Lovejoy (CT 03121)
            P.O. Box 56
            276 Center Road
            Easton, Connecticut 06612
            (203) 459-9941
            (203) 459-9943 (telefax)

DouglasReplyBrief.doc

Exhibit  A

*C O P y*

1

```
1                   UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT
2
  * * * * * * * * * * * * * * *
3                              *      CIVIL ACTION NO.
  NORMAN C. BLOOM,             *
4              Plaintiff       *      302 CV 1619 AWT
                               *
5        v.                    *
                               *
6                              *
  MICHAEL A. DOUGLAS           *
7              Defendant       *
                               *      AUGUST 6, 2003
8  * * * * * * * * * * * * * * *
  MICHAEL A. DOUGLAS,          *
9      Third-Party Plaintiff   *
                               *
10        v.                    *
                               *
11                              *
  NORMAN C. BLOOM, NORMAN R.   *
12 BLOOM REVOCABLE TRUST,       *
  NORMAN R. BLOOM FAMILY SPRAY *
13 TRUST, and NORMAN R. BLOOM   *
  IRREVOCABLE INSURANCE TRUST  *
14     Third-Party Defendants   *
  * * * * * * * * * * * * * * *
15

16

17          Deposition of RICHARD DiMARCO, ESQ.

18          Deposition taken in the above-entitled action,

19     pursuant to the Stipulations set forth herein, before

20     Marion Strachman, Notary Public, at the Law Offices of

21     COHEN & WOLF, P.C. 1115 Broad Street, Bridgeport, Ct.

22     on the 8th day of August, 2003, 10:10 a.m.

23

24
```

**Marion Strachman**
*Certified Court Reporter*
93 Silvermine Avenue
Norwalk, CT 06850                    (203) 846-0549

1    Q    You testified that you represented Mr.

2  Bloom over a period of, approximately, 5 years.

3  Is that correct?

4    A    Yeah, it was 1995 through--

5    Q    2001?

6    A    --2001, yeah.

7    Q    During that time period, did you ever

8  have any discussions with Mr. Douglas

9  concerning what legal strategy should be taken

10  on behalf of Mr. Bloom or any of the other

11  clients that come under Mr. Bloom's umbrella?

12    A    What case we would pursue, what move we

13  would make, yeah, just like I would discuss it

14  with Norman.

15    Q    What was the purpose of discussing it

16  with Mr. Douglas?

17    A    Mike was his very close advisor. Mike

18  was the one who had Norman's ear on everything.

19  Norman never made a move without first

20  discussing it with Mike.

21    Q    And the discussions you had with Mr.

22  Douglas, did they involve legal strategy to be

23  taken on behalf of Mr. Bloom or all the

24  umbrella clients?

31

1     A   The discussions could involve anything.

2 They would be discussions that I would normally

3 have with a client. He was Norman's

4 representative.

5     Q   Did you ever have any discussions about

6 what legal actions might be brought on behalf

7 of Mr. Bloom with Mr. Douglas?

8     A   I'm sure.

9     Q   Is that a yes?

10    A   Yeah, just like we would discuss it

11 with Norman.

12    Q   Did Mr. Douglas have any input into

13 what legal strategies your firm might pursue on

14 behalf of Mr. Bloom?

15    A   Just as any client would, yes.

16    Q   I'm asking you what Mr. Douglas did. I

17 don't want to know what you do with your

18 clients. I'm trying to restrict my questions to

19 what conversations or discussions that you and

20 Mr. Douglas had.

21    A   I'm trying to give you a sense of what

22 Mike's role was. He was Norman's close advisor.

23 Norman didn't do anything without speaking

24 with Mike. He, literally, talked with Mike, I

**Marion Strachman**
*Certified Court Reporter*
93 Silvermine Avenue
Norwalk, CT 06850       (203) 846-0549

1    think, everyday and sometimes for hours at a

2    time about, you know, what we were going to do

3    and sometimes Mike would communicate Norman's

4    thoughts to me.

5        Q    Were there times that Mr. Douglas

6    communicated his own thoughts to you on a legal

7    strategy or--

8        A    I'm sure he had lots of thoughts about

9    things.

10       Q    I don't want you to be sure he had lots

11   of thoughts about things. Did you have any

12   discussions with Mr. Douglas at any time about

13   what legal strategies to pursue on behalf of

14   Mr. Bloom?

15       A    Sure.

16       Q    Is that a yes?

17       A    Sure would be yes.

18       Q    When you say, "sure," I will ask you if

19   it means yes or no, Mr. DiMarco.

20       A    Yes.

21       Q    Did you ever have any discussions with

22   Mr. Douglas about bringing RICO claims against

23   his uncle, Hillard?

24       A    We had drafted a Complaint, which had

**Marion Strachman**
*Certified Court Reporter*
93 Silvermine Avenue
Norwalk, CT 06850                    (203) 846-0549

1    multiple claims in it, and I think we, I mean

2    Cohen & Wolf, had considered putting in a RICO

3    Count.

4         Q    Did you ever have any discussions with

5    Mr. Douglas about a RICO count on behalf of Mr.

6    Bloom?

7         A    Probably just like we discussed any

8    other--

9         Q    Did you regularly discuss with Mr.

10   Douglas any legal strategy that you might take

11   on behalf of Mr. Bloom during the course of the

12   5 years that you represented Mr. Bloom?

13        A    Sure. He was Norman's advisor.

14        Q    When you say "sure," you mean yes?

15        A    Yes, he was Norman's advisor.

16        Q    I mean regardless of what he was, I'm

17   just trying to get a sense of what was

18   discussed. Were there times when Cohen & Wolf

19   drafted legal proceedings that were filed in

20   court, including the Probate Court?

21        A    Absolutely. Yes.

22        Q    And before they were filed, were those

23   copies or drafts of those pleadings sent to Mr.

24   Douglas so that he could review them and make

1  any comments that he might have?

2      A    As well as Norman, Mark Errico and

3  anyone else on Norman's team. He had a whole

4  team of people.

5      Q    Okay. That's fine. I'm just trying to

6  restrict it to-- Answer anyway you want. I can

7  tell you the more you answer, the longer that

8  we will be here. So, I have a sense, is it your

9  testimony, that basically each and every

10  pleading that Cohen & Wolf drafted for

11  submission to a court was sent to Mr. Douglas

12  so that he could review it and make a comment on

13  it?

14      A    That is a pretty broad statement, each

15  and every pleading.

16      Q    Do you know of any pleadings drafted by

17  Cohen & Wolf that weren't sent to Mr. Douglas

18  for his comment or review?

19      A    No, I can't answer that. I don't know if

20  there were any that were not sent.

21      Q    As a matter of course, did you send

22  drafts of pleadings to Mr. Douglas for his

23  review and comment before they were filed in a

24  court in Connecticut?

1    any particular aspect of legal practice?

2        A    No.

3        Q    Did you ever learn from any other

4    source whether or not Mr. Douglas had any

5    specialty in any aspect of legal practice?

6        A    No.

7        Q    Can you describe for us, and this may

8    take some time to do, give us a thumbnail

9    description of what transpired over the 5 years

10   on behalf of Mr. Bloom? Why don't we start this

11   way. Can you tell us what legal proceedings, if

12   any, were brought on behalf of Mr. Bloom by

13   Cohen & Wolf?

14       A    Let's see. Initially, there were

15   proceedings to obtain information about

16   Tallmadge.

17       Q    And did Mr. Douglas attend any of those

18   proceedings, to your knowledge?

19       A    I can't remember. I assume so. I won't

20   assume. The answer is I can't remember.

21       Q    Do you remember Mr. Douglas attending

22   any legal proceedings on behalf of Mr. Bloom?

23       A    Attending? You mean as a spectator?

24       Q    Being present in court or at a Probate

1   conference or whatever.

2       A    Yes.

3       Q    And how many legal proceedings or legal

4   Probate proceedings do you remember Mr.

5   Douglas being present at?

6       A    I would say he attended most of them

7   with Norman.

8       Q    And those legal proceedings or Probate

9   proceedings took place in the State of

10  Connecticut. Is that correct?

11      A    Yes.

12      Q    Any legal proceedings or Probate

13  proceedings take place in any other states in

14  the State of Connecticut?

15      A    No.

16      Q    In the spring or summer of 2001, was

17  there a case that was tried before the Superior

18  Court in Bridgeport involving actions of, I

19  guess, director or shareholders of Tallmadge

20  Brothers?

21      A    Yes.

22      Q    And what did that trial involve?

23      A    We had to invalidate the actions taken

24  at a shareholders' meeting of Tallmadge.

1    Q    And who sat on that trial? Which judge

2    was that?

3    A    I can't remember his name. Do you?

4    Q    I wasn't there. Did Mr. Douglas attend

5    the trial proceedings before the named judge

6    that we're referring to?

7    A    Yeah, along with Norman, his brothers,

8    his cousins. They all sat in the audience.

9    Q    And how long did that trial take?

10    A    A few days, I think.

11    Q    And that trial took place in the State

12    of Connecticut?

13    A    Right here in Bridgeport (indicating),

14    yes.

15    Q    Cohen & Wolf brought a proceeding

16    against Robert Bloom in the Probate Court in

17    Norwalk, did he not?

18    A    Yes.

19    Q    And in drafting the documents that were

20    submitted in that proceeding, were they sent to

21    Mr. Douglas for his review or comment?

22    A    Probably.

23    Q    Was it Cohen & Wolf's practice, at that

24    time, to send him such documents or pleadings?

```
 1        A    Yes. Sent them to everyone on Norman's
 2    team. Norman, Mike, Mike Errico.
 3        Q    Do you remember if he got any
 4    recommended changes to those pleadings from
 5    Mr. Douglas?
 6        A    Possibly.
 7        Q    Were there any differences of opinion
 8    between you or the attorneys at Cohen & Wolf
 9    and Mr. Douglas as to how to proceed with
10    respect to Mr. Bloom's claims?
11        A    Sure.
12        Q    Tell us what disputes arose between the
13    strategy, if you will.
14        A    I wouldn't characterize them as
15    disputes.
16        Q    Well, how would you characterize them
17    so we're not using my words?
18        A    Sometimes Mike would say you should sue
19    him, you should sue her, you should sue
20    everyone.
21        Q    Would it be fair to say Mr. Douglas
22    wanted Cohen & Wolf to sue somebody on behalf
23    of Mr. Bloom?
24        A    Yeah.
```

1  number of conferences or meetings with

2  corporate counsel and the individual attorneys

3  representing the heirs of the shareholders?

4       A    Sure. Yes.

5       Q    Was it less than 100 or more than 100?

6       A    Less than 100, I would say.

7       Q    And did Mr. Douglas attend those

8  conferences or meetings that took place with

9  Siegel, O'Connor, Schiff & Zangari?

10      A    I'm sure he attended some of them,

11 yeah, as did Norman and his brothers.

12      Q    Do you know whether he attended most of

13 them?

14      A    It is hard to answer. I would be

15 guessing as to how many meetings he attended.

16      Q    Well, do you know whether it was a

17 majority of the meetings or conferences?

18      A    If you want me to guess, I can guess.

19      Q    What is your best estimate?

20      A    My guess is probably he attended a

21 majority of them.

22      Q    And those meetings, if I'm correct, all

23 took place in the State of Connecticut?

24      A    As far as I know, yes.

**Marion Strachman**
*Certified Court Reporter*
93 Silvermine Avenue
Norwalk, CT 06850

(203) 846-0549

1    Q    And did they take place at the

2  corporate counsel's office or somewhere else?

3    A    Now, you're talking about board

4  meetings or settlement negotiations?

5    Q    I'm talking about the reorganization

6  meetings at Siegel's office.

7    A    I'm sure there were meetings that took

8  place in this room here, at my Westport office,

9  at Siegel, O'Connor's office in New Haven.

10    Q    And what was your understanding of Mr.

11  Douglas' purpose in being at those meetings?

12    A    He was Norman's closest advisor. Norman

13  didn't make any decision without discussing it

14  with Mike first.

15    Q    I will hand to you, Mr. DiMarco, what

16  has been marked as Plaintiff's Exhibit F for

17  identification and ask you if you have ever

18  seen that document prior to today?

19           (Document handed to deponent)

20    A    No, I don't recall this.

21    Q    Did you, notwithstanding the fact that

22  you haven't seen that document, have any

23  discussion with Mr. Douglas about the

24  substance of what is discussed in that

1    A    No. I can say I never got a letter that

2  said, "Michael A. Douglas, business advisor to

3  Norman Bloom."

4    Q    Did you ever get any letterhead from

5  Mr. Douglas that said that "Michael A. Douglas,

6  business advisor" during that 5 year period?

7    A    Not that I recall. I mean we play a lot

8  of roles. Do you write on your letters, "Fred

9  Lovejoy, father to children?" I mean I'm not

10  sure what kind of a question that is.

11    Q    A simple question. Mr. DiMarco, during

12  the course of your testimony, you stated that

13  you thought that Mr. Douglas was acting as an

14  advisor or business advisor to Mr. Bloom,

15  correct?

16    A    Yes, because there were conversations

17  that took place during the 5 year period-- The

18  reason that we were hired is because Norman

19  needed co-counsel. Mike told him from day one

20  that he was not licensed to practice law in

21  Connecticut. That he had to hire co-counsel.

22  They were dissatisfied and they hired Cohen &

23  Wolf.

24    Q    That's fine.

1  that's what Mr. Douglas was providing to Mr.

2  Bloom?

3      A   Mr. Douglas, as far as I was concerned,

4  was an advisor to Norman part of his time just

5  like Mike Errico.

6      Q   You don't know whether he was giving

7  Mr. Bloom legal advice or business advice? I

8  mean what you gave him with respect to business

9  organization stuff, you charged a legal fee

10 for, right?

11     A   That was my role. I was providing legal

12 advice, yeah, and representation.

13     Q   And if Mr. Douglas was providing the

14 same type of advice, is that legal advice that

15 he is giving Mr. Bloom or because it is done by

16 Mr. Douglas it is something else?

17     A   That probably calls for a conclusion

18 that I'm not qualified to make.

19     Q   Okay. The business advice, as you call

20 it, that you gave to Mr. Bloom about trust and

21 estates or reorganization, when you do that for

22 a client in the State of Connecticut, you

23 consider that to be legal advice, do you not?

24     A   Yes, I was his lawyer. I don't dispute

<u>CERTIFICATION</u>

This is to certify that a copy of the attached was mailed on May 27, 2004, postage

prepaid, to:

Joshua Lanning, Esq.
Ira B. Grudberg, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
New Haven, Connecticut 06503

FREDERICK A. LOVEJOY

10